# No. 23-467(L)

**23-469(con)**

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

---

In re VOYAGER DIGITAL HOLDINGS, INC.,

*Debtors,*

VOYAGER DIGITAL HOLDINGS, INC.,

*Debtor-Appellant,*

OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF
VOYAGER DIGITAL HOLDINGS, INC.,

*Intervenor-Appellant,*

—v.—

UNITED STATES OF AMERICA, UNITED STATES TRUSTEE FOR REGION 2,

*Appellees.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

## APPELLEES' MEMORANDUM IN OPPOSITION TO
APPELLANTS' MOTION TO STAY

---

RAMONA D. ELLIOTT
Deputy Director/General
Counsel
P. MATTHEW SUTKO
Associate General Counsel
BETH A. LEVENE
Trial Attorney
Department of Justice
Executive Office for
United States Trustees
441 G Street, NW, Suite 6150
Washington, DC 20530
Tel: (202) 307-1399

WILLIAM K. HARRINGTON
United States Trustee for Region 2
LINDA A. RIFFKIN
Assistant United States Trustee
Department of Justice
Office of the United States Trustee
Alexander Hamilton Custom House
One Bowling Green, Room 534
New York, NY 10004
Tel: (212) 510-0500

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
LAWRENCE H. FOGELMAN
JEAN-DAVID BARNEA
PETER ARONOFF
BENJAMIN H. TORRANCE
Assistant United States Attorneys
United States Attorney's Office
Southern District of New York
86 Chambers Street, Third Floor
New York, NY 10007
Tel: (212) 637-2800

# TABLE OF CONTENTS

Introduction ...................................................................................... 1

Statement ........................................................................................... 3

    A.   Background ........................................................................ 3

    B.   The Exculpation Provision ............................................ 6

    C.   Prior Proceedings ........................................................ 13

ARGUMENT .................................................................................... 16

POINT I—This Court Lacks Jurisdiction over This Appeal ................. 16

POINT II—Voyager's Motion to Vacate the District Court's Stay of
the Confirmation Order Should Be Denied ................................... 24

    A.   Standard for a Vacating a Stay Pending Appeal ................. 25

    B.   Appellants Are Unlikely to Prevail on the Merits Because
the Bankruptcy Court Erred in Confirming the
Exculpation Clause ........................................................ 28

        1.   The Bankruptcy Court Lacked Statutory Authority
to Confirm the Exculpation Clause ............................. 28

        2.   The Statutes Cited by the Bankruptcy Court and
the Appellants Do Not Support the Exculpation
Clause ........................................................................ 37

        3.   No Court Has Approved a Similar Exculpation
Clause ........................................................................ 40

        4.   The Exculpation Clause's Exceptions Do Not
Mitigate Its Flaws ..................................................... 46

    C.   The Remaining Stay Factors Emphatically Favor the
Government ................................................................... 49

Conclusion ...................................................................................... 55

# TABLE OF AUTHORITIES

Page(s)

*Cases*

*Andrus v. Glover Constr. Co.,*
  446 U.S. 608 (1980) ............................................................... 39
*Barretta v. Wells Fargo Bank, N.A.,*
  693 F. App'x 26 (2d Cir. 2017) ............................................. 22
*Blixseth v. Credit Suisse,*
  961 F.3d 1074 (9th Cir. 2020) .............................................. 41
*Braatelien v. United States,*
  147 F.2d 888 (8th Cir. 1945) ................................................. 44
*Brady v. National Football League,*
  640 F.3d 785 (8th Cir. 2011) ................................................. 53
*Carson v. Am. Brands, Inc.,*
  450 U.S. 79 (1981) ................................................................ 20
*Certain Named & Unnamed Non-Citizen Children & Their*
  *Parents v. Texas,* 448 U.S. 1327 (1980) ......................... 26, 27
*Cheney v. U.S. District Court,*
  542 U.S. 367 (2004) .............................................................. 23
*Citigroup Global Markets, Inc. v. VCG Special Opportunities*
  *Master Fund Ltd.,* 598 F.3d 30 (2d Cir. 2010) .............. 26, 27
*City of New York v. New York, N.H. & H.R. Co.,*
  344 U.S. 293 (1953) .............................................................. 36
*Clapper v. Amnesty Int'l USA,*
  568 U.S. 398 (2013) .............................................................. 34
*Coleman v. Paccar Inc.,*
  424 U.S. 1301 (1976) ............................................................ 26
*Colorado v. EPA,*
  989 F.3d 874 (10th Cir. 2021) .............................................. 54
*Consumers Gas & Oil, Inc. v. Farmland Indus., Inc.,*
  84 F.3d 367 (10th Cir. 1996) ................................................. 22
*Czyzewski v. Jevic Holding Corp.,*
  580 U.S. 451 (2017) .............................................................. 31
*Dist. 4 Lodge of the Int'l Assoc. of Machinists & Aerospace Workers*
  *v. Raimondo,* 18 F.4th 38 (1st Cir. 2021) ......................... 49

*Doe v. Gonzales*,
546 U.S. 1301 (2005) ................................................................ 27

*FDIC v. Meyer*,
510 U.S. 471 (1994) ................................................................ 36

*Garvin v. Cook Invs. NW, SPNWY, LLC*,
922 F.3d 1031 (9th Cir. 2019) ............................................. 43

*Gulfstream Aerospace Corp. v. Mayacamas Corp.*,
485 U.S. 271 (1988) ................................................................ 21

*Hand v. Scott*,
888 F.3d 1206 (11th Cir. 2018) ........................................... 49

*HBE Leasing Corp v. Frank*,
48 F.3d 623 (2d Cir. 1995) .................................................... 20

*Heckler v. Chaney*,
470 U.S. 821 (1985) ................................................................ 33

*Henrietta D. v. Giuliani*,
246 F.3d 176 (2d Cir. 2001) ................................................. 20

*Huminski v. Rutland City Police Dep't*,
221 F.3d 357 (2d Cir. 2000) ................................................. 20

*Imbler v. Pachtman*,
424 U.S. 409 (1976) ................................................................ 44

*In re A.H.*,
999 F.3d 98 (2d Cir. 2021) .................................................... 23

*In re A & F Enterprises, Inc. II*,
742 F.3d 763 (7th Cir. 2014) ................................................ 22

*In re Adelphia Commc'ns Corp.*,
361 B.R. 337 (S.D.N.Y. 2007) .............................................. 52

*In re Airadigm Commc'ns, Inc.*,
519 F.3d 640 (7th Cir. 2008) ................................................ 43

*In re American Express Financial Advisors Securities Litigation*,
672 F.3d 113 (2d Cir. 2011) ................................................. 23

*In re AroChem Corp.*,
176 F.3d 610 (2d Cir. 1999) ................................................. 16

*In re Center Teleproductions, Inc.*,
112 B.R. 567 (Bankr. S.D.N.Y. 1990) ................................ 44

*In re CMC Heartland Partners*,
966 F.2d 1143 (7th Cir. 1992) .............................................. 31

*In re Dairy Mart Convenience Stores, Inc.*,
351 F.3d 86 (2d Cir. 2003) ............................................. 39, 40

*In re Enron Corp.*,
  326 B.R. 497 (S.D.N.Y. 2005) ............................................................ 42
*In re Flor*,
  79 F.3d 281 (2d Cir. 1996) ........................................................... 16, 17
*In re Forty-Eight Insulations, Inc.*,
  115 F.3d 1294 (7th Cir. 1997) ..................................................... 18, 22
*In re Fremont Sheep Co.*,
  110 F.3d 73 (10th Cir. 1997) ............................................................. 22
*In re Granite Broad. Corp.*,
  369 B.R. 120 (Bankr. S.D.N.Y. 2007) .............................................. 42
*In re Highland Cap. Mgmt., LP*,
  48 F.4th 419 (5th Cir. 2022) .............................................................. 41
*In re PWS Holding Corp.*,
  228 F.3d 224 (3d Cir. 2000) ........................................................ 42, 44
*In re Rae*,
  436 B.R. 266 (Bankr. D. Conn. 2010) ............................................... 34
*In re Revel AC, Inc.*,
  802 F.3d 558 (3d Cir. 2015) ............................................................... 18
*In re Sonnax Industries*,
  907 F.2d 1280 (2d Cir. 1990) ............................................................. 17
*In re Trans World Airlines, Inc.*,
  18 F.3d 208 (3d Cir. 1994) ............................................ 17, 18, 19, 21
*In re Western Real Est. Fund, Inc.*,
  922 F.2d 592 (10th Cir. 1990) ........................................................... 41
*In re Windstream Holdings, Inc.*,
  No. 20 Civ. 4276 (VB), 2020 WL 4481933 (S.D.N.Y. Aug. 3, 2020) .... 52
*In re World Trade Center Disaster Site Litigation*,
  503 F.3d 167 (2d Cir. 2007) .............................................................. 26
*Kensington Int'l Ltd. v. Republic of Congo*,
  461 F.3d 238 (2d Cir. 2006) .............................................................. 23
*Lane v. Pena*,
  518 U.S. 187 (1996) ........................................................................... 37
*Law v. Siegel*,
  571 U.S. 415 (2014) .................................................................... 30, 39
*Library of Congress v. Shaw*,
  478 U.S. 310 (1986) ........................................................................... 37
*Logan v. Zimmerman Brush Co.*,
  455 U.S. 422 (1982) ........................................................................... 35

iv

*Maryland v. King*,
  567 U.S. 1301 (2012) ................................................................ 49
*McGuire v. United States*,
  550 F.3d 903 (9th Cir. 2008) ................................................... 37
*In re Metromedia Fiber Network, Inc.*,
  416 F.3d 136 (2d Cir. 2005) ............................................. 40, 51
*Michael v. INS*,
  48 F.3d 657 (2d Cir. 1995) ...................................................... 23
*N.M. Dep't of Game & Fish v. Dep't of the Interior*,
  854 F.3d 1236 (10th Cir. 2017) .............................................. 49
*Nken v. Holder*,
  556 U.S. 418 (2009) ........................................... 19, 20, 21, 49
*Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*,
  458 U.S. 50 (1982) ................................................................. 28
*Norwest Bank Worthington v. Ahler*,
  485 U.S. 197 (1988) ............................................................... 38
*Nosik v. Singe*,
  40 F.3d 592 (2d Cir. 1994) ..................................................... 20
*O Centro Espirita Beneficiente Uniao de Vegetal v. Ashcroft*,
  314 F.3d 463 (10th Cir. 2002) ................................................ 49
*O'Loghlin v. County of Orange*,
  229 F.3d 871 (9th Cir. 2000) .................................................. 31
*Park Village Apartment Tenants Ass'n v. Mortimer Howard Tr.*,
  636 F.3d 1150 (9th Cir. 2011) ................................................ 26
*Pennsylvania v. New Jersey*,
  426 U.S. 660 (1976) ............................................................... 54
*Providence Journal Co. v. FBI*,
  595 F.2d 889 (1st Cir. 1979) .................................................. 51
*Railway Labor Execs.' Ass'n v. Gibbons*,
  455 U.S. 457 (1982) ............................................................... 29
*Raines v. Byrd*,
  521 U.S. 811 (1997) ............................................................... 34
*Ritzen Group, Inc. v. Jackson Masonry, LLC*,
  140 S. Ct. 582 (2020) ............................................................. 17
*S.S. Body Armor I., Inc. v. Carter Ledyard & Milburn LLP*,
  927 F.3d 763 (3d Cir. 2019) ............................................. 18, 27
*Sahu v. Union Carbide Corp.*,
  475 F.3d 465 (2d Cir. 2007) ................................................... 21

*SEC v. Ginder*,
    752 F.3d 569 (2d Cir. 2014) ................................................................ 47
*SEC v. Universal Exp., Inc.*,
    475 F. Supp. 2d 412 (S.D.N.Y. 2007) ............................................ 30, 44
*Shimer v. Fugazy (In re Fugazy Express, Inc.)*,
    982 F.2d 769 (2d Cir. 1992) ................................................................ 17
*Stellwagen v. Clum*,
    245 U.S. 605 (1918) ............................................................................ 29
*Stewart v. Lattanzi*,
    832 F.2d 12 (2d Cir. 1987) ............................................................ 45, 47
*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014) ............................................................................ 33
*Thompson v. DeWine*,
    959 F.3d 804 (6th Cir. 2020) ............................................................... 49
*Travelers Indemnity Co. v. Bailey*,
    557 U.S. 137 (2009) ............................................................................ 34
*U.S. Forest Serv. v. Cowpasture River Pres. Ass'n*,
    140 S. Ct. 1837 (2020) ........................................................................ 35
*United States v. Dalm*,
    494 U.S. 596 (1990) ............................................................................ 36
*United States v. Security Indus. Bank*,
    459 U.S. 70 (1982) .............................................................................. 36
*United States v. Testan*,
    424 U.S. 392 (1976) ............................................................................ 37
*Veasey v. Abbott*,
    870 F.3d 387 (5th Cir. 2017) ............................................................... 49
*Webster v. Fall*,
    266 U.S. 507 (1925) ............................................................................ 42
*Will v. Hallock*,
    546 U.S. 345 (2006) ............................................................................ 19
*Williams v. U.S. Fid. & Guar. Co.*,
    236 U.S. 549 (1915) ............................................................................ 29
*Wright v. Union Central Life Ins. Co.*,
    304 U.S. 502 (1938) ............................................................................ 28

*Statutes*

11 U.S.C. § 105(a) ............................................................................ 38, 39
11 U.S.C. § 1103(c) ................................................................................ 44

11 U.S.C. § 1123(b)(6) ................................................................ 40

11 U.S.C. § 1125(e) .................................................................... 30

11 U.S.C. § 1129(a)(3) ................................................................ 40

11 U.S.C. § 1141(d) .................................................................... 29

11 U.S.C. § 1142(a) ............................................................... 37, 38

11 U.S.C. § 362(b)(1) .................................................................. 31

11 U.S.C. § 362(b)(4) .................................................................. 31

18 U.S.C. § 3613 ......................................................................... 34

28 U.S.C. § 158(d)(1) .................................................................. 16

28 U.S.C. § 959(b) ...................................................................... 31

28 U.S.C. § 1292(a) ............................................................... 19, 21

28 U.S.C. § 1651(a) ..................................................................... 23

31 U.S.C. § 3731(b)(1) ................................................................ 32

*Rules*

Fed. R. App. P. 21 ...................................................................... 23

## Introduction

Voyager Digital Holdings, Inc., and its affiliates ("Voyager") constitute a cryptocurrency firm that filed for bankruptcy in 2022. In March 2023, the bankruptcy court confirmed Voyager's chapter 11 plan of reorganization. Over the objections of appellees the United States and the United States Trustee (together, the "government"), that plan included a broad and extraordinary exculpation provision, which purports to forever immunize Voyager, as well as a host of non-debtor entities, from civil and even criminal liability under federal (and state) law. The provision applies to any actions taken—or that will be taken—to negotiate, execute, or implement any transactions approved by the bankruptcy court in the plan, except for certain actions involving actual fraud, willful misconduct, or gross negligence. The plan would leave the Executive Branch only the theoretical opportunity to seek to enjoin prospective violations of law—at least until Voyager consummates the plan, which it has stated it intends to do as quickly as possible. Dist. Ct. Dkt. 5, Ex. E, at 34-35.[1]

_____

[1] "Dist. Ct. Dkt." refers to docket entries in _United States v. Voyager Holdings, Inc._, No. 23 Civ. 2171 (S.D.N.Y). "Dkt." refers to the

The government appealed to the district court, which stayed the bankruptcy court's confirmation order. That stay should be affirmed. Plaintiffs are unlikely to prevail on the merits because the exculpation provision, which purports to preemptively immunize future conduct from civil and criminal law enforcement, is plainly unlawful. No provision of the Bankruptcy Code authorizes such an extraordinary power. Even if the Code's silence were understood as ambiguity on this question, the serious constitutional concerns raised by the confirmation order militate strongly against construing the Code to permit a single bankruptcy judge to interfere with the Executive Branch's prerogative to implement and enforce federal law.

The remaining stay factors decisively favor the district court's order. Counsel for Voyager has candidly stated that, absent a stay, Voyager intends to act swiftly to consummate the bankruptcy plan and thereby (in its view) render any appeal equitably moot. Dist. Ct. Dkt. 5, Ex. E, at 34-35. If successful, that would have the (intended) effect of implementing a plan provision that immunizes Voyager's future

---

bankruptcy court's docket, *In re Voyager Holdings, Inc.,* Case No. 22-10943 (Bankr. S.D.N.Y).

conduct from law enforcement, without any review of the lawfulness of that provision by any Article III court. That would cause irreparable harm to both the Executive Branch and the public interest. Voyager's alleged harm—that a stay might impede implementation of the plan and halt payments to Voyager's customers—is insubstantial by comparison, particularly as the restructuring transactions contemplated by the plan are able to proceed if just the exculpation clause is voluntarily excised or stayed but the rest of the plan remains in effect. Every day, parties engage in substantial commercial transactions (including transactions involving cryptocurrency) without the benefit of a preemptive release from criminal and civil liability. It is not too much to ask Voyager and the other parties to comply with federal law in implementing the plan pending the district court's review.

## Statement

### A.    Background

Voyager is a cryptocurrency firm that filed for chapter 11 bankruptcy on July 5, 2022. Dkt. 1. Voyager's initial bankruptcy plan was to sell its assets to FTX US, but that plan collapsed in November 2022, with FTX's implosion. Under its revised plan, Voyager will sell its

3

assets to BAM Trading Services Inc. ("Binance.US") under an Asset

Purchase Agreement ("APA"), or "toggle" and distribute crypto to

customers itself without the sale to Binance.US.[2] Under the sale

scenario, Binance.US will receive the cryptocurrency that is currently

on the Voyager platform to hold in a custodial capacity for Voyager's

customers. Dkt. 1166-1 ("Plan") 30-31; Dkt. 863 (amended disclosure

statement) at 7, 35. Binance.US will then distribute the transferred

cryptocurrency to the customers. Dkt. 863 at 7, 34-36. In addition,

Voyager is authorized to engage in "rebalancing" transactions by

"(i) selling such Cryptocurrency that cannot be distributed to Account

Holders, (ii) purchasing Cryptocurrency supported by Voyager's or

Binance.US's Platform (as provided by the Asset Purchase Agreement)

that shall be distributed to Account Holders, and (iii) engaging in any

other transaction, including the execution of trades of Cryptocurrency,

necessary or appropriate to effectuate distributions . . . ." Plan at 32.

---

[2] Appellants are mistaken in claiming that the plan received overwhelming support. *E.g.*, UCC Mem. 84 n.9. Although 97% of the voting creditors voted in favor of the plan, only 6.3% of the Voyager creditors eligible to vote actually returned ballots—meaning 94% abstained from voting. *See* Dkt. No. 926 at 10 (977,134 received ballots); Dkt. No. 1127 at 9 (61,300 Class 3 Ballots returned).

Accounts that cannot be transferred to Binance.US will be administered by a new entity, the Wind-Down Debtor (administered by a Plan Administrator). Plan at 16, 35. Binance.US and the Wind-Down Debtor will be authorized to operate their businesses and use and dispose of property "without supervision or approval" of the bankruptcy court, *id*. at 31, and the Plan Administrator will be empowered to make distributions, sell assets, oversee accounts, prosecute and settle claims, retain professionals, pay expenses, including taxes, and "tak[e] all other actions consistent with the provisions of the Plan and the Plan Administrator Agreement," *id.* at 37-40.

If the sale to Binance.US is not consummated within four months after the date of the APA, Voyager will toggle to its alternative liquidation plan, *id.* at 11, 31-32; Dkt. 835 at 63, and will be authorized to "take all actions as may be deemed necessary or appropriate" to consummate the liquidation. Plan at 32. Further operations in this scenario may occur "without supervision or approval" of the bankruptcy court. *Id.*

## B.    The Exculpation Provision

The first iteration of a plan proposing a sale to Binance.US was filed on December 22, 2022, less than four months before the bankruptcy court entered the confirmation order. Earlier versions of the plan contained broad exculpation provisions. *E.g.*, Dkt. 852 at 57. The Securities and Exchange Commission and the U.S. Trustee objected. Dkt. 1047, 1085. Among other grounds, the U.S. Trustee argued the plan would inappropriately provide prospective releases to entities that do not yet exist, such as the Wind-Down Debtor and the Plan Administrator. Dkt. 1085 at 3, 16-18. On February 28, 2023, Voyager then included language in a proposed confirmation order that would have principally—and appropriately—carved the government out of any exculpation or releases in the plan. Dkt. 1120 at 64-65.

However, on March 2, 2023, during the confirmation hearing— weeks after the voting deadline and objections were due, and without notice to anyone—Voyager for the first time added language that would expressly undo the government carve-out they had previously proposed, providing that the federal and state governments "may not, and will not, allege that the Restructuring Transactions are a violation of any

6

rules or regulations," and will not "bring any claim against any Person on account of or relating to the Restructuring Transactions." Dkt. 1130, ¶¶ 142-43. The government objected immediately to the removal of the governmental carve-out because the exculpation language improperly bars the government from enforcing its laws and regulations, including criminal ones. Dkt. 1132. Other federal and state entities also objected, Dkt. 1134, 1135, 1136, and the government filed a further objection, Dkt. 1144.

The bankruptcy court nevertheless stated it would approve an exculpation provision insulating Voyager, Binance.US, and others from civil and criminal liability for past and future acts taken in connection with their consummation of the transactions contemplated by the plan. Dist. Ct. Dkt. 5, Ex. D, at 19-22. The court rejected the government's argument that it did not have the authority to release criminal liability or "enjoin a criminal prosecution of any person for any reason." *Id*. at 25-26. The court responded:

> if what you're saying is that having sat on the sidelines and said nothing to me to indicate that there's anything illegal about what these people are going to do, that you want to reserve the right to put somebody in jail for doing a rebalancing transaction that they will have no choice but to do under the order that I entered, then I disagree with you. I

think the very suggestion offends me to no end. I can't
believe that you would even take the position in front of me
that you should have that right. It's preposterous. It's
absolutely preposterous. If you think something's that
illegal, speak up, but don't dare tell me that you kind of want
to reserve that right to do that to somebody.

*Id.*

The bankruptcy court's March 8, 2023, confirmation order revised
the exculpation provision as described below. Dkt. 1159, 1166. The
government filed its notice of appeal to the district court the next day.
Dkt. 1165; *see* Dkt. 1216 (amended notice of appeal). The court's March
11, 2023, written decision (A.130-79)[3] concluded that in the less than
four months between the filing of the plan in December 2022 and the
confirmation hearing in March 2023, "[t]he SEC and all other
government agencies have had a full and fair opportunity to object if
they believe that the rebalancing transactions that I have previously
approved and that are contemplated by the plan are illegal in any way,
or if they believe that the distributions of cryptocurrencies and cash
that are contemplated by the plan are violative in any way of any
applicable statute, rule or regulation." (A.142).

---

[3] "A." refers to the Appendix filed by Voyager (ECF No. 30-2).

8

The court's modifications to the exculpation provision did not cure its impermissible overbreadth. The confirmed plan defines the "Exculpated Parties" as including Voyager, the Committee of Unsecured Creditors ("Committee" or "UCC"), the Distribution Agent (i.e., Binance.US, Voyager, and the Wind-Down Debtor), certain professionals retained by those entities, certain Voyager employees, and the Plan Administrator. Plan at 8.

The confirmation order revised the exculpation provision (Article VIII.C) to the following:

> Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor release or the third-party release, and except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and **each Exculpated Party is hereby exculpated from, any liability for damages based on the negotiation, execution and implementation of any transactions or actions approved by the Bankruptcy Court in the Chapter 11 Cases, except for Causes of Action related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence** . . . .

> In addition, the Plan contemplates certain rebalancing transactions and the completion of distributions of cryptocurrencies to creditors. **The Exculpated Parties shall have no liability for, and are exculpated from, any claim for fines, penalties, damages, or other liabilities based on their execution and completion of**

9

> **the rebalancing transactions and the distribution of cryptocurrencies to creditors in the manner provided in the Plan.**

(A.7-8 (emphasis added)). Thus, the confirmation order broadly exculpates for "the negotiation, execution and implementation of any transactions or actions" approved by the bankruptcy court, with an exception if there is a final order finding that the cause of action is based on "actual fraud, willful misconduct, or gross negligence." *Id.* at 7.

But that is not all it does. The order additionally exculpates—with no exception for actual fraud, willful misconduct, or gross negligence—for "any claim for fines, penalties, damages, or other liabilities based on [the Exculpated Parties'] execution and completion of the rebalancing transactions and the distribution of cryptocurrencies to creditors in the manner provided in the Plan." *Id.* at 8. This is not a narrow provision, and it is prospective. As explained in the Plan and the APA, under the sale transaction, distribution of cryptocurrencies will occur through the Binance.US platform and will require, *inter alia*:

- a transfer of the Voyager customers' personal data to Binance.US, ECF 835 at 54-55;

- negotiation of a transition services agreement between Voyager and Binance.US to allow Binance.US to access and operate the

Voyager platform for purposes of accomplishing several of the transactions contemplated in the APA, *id*. at 56;

- development of an "integration plan" by Voyager and Binance.US to enable the user migration to the Binance.US platform, *id*. at 58;

- crediting to each user's Binance.US account with the coins owed under the Plan, which credits "may be made from any Coins held by or on behalf of [Binance.US] or any of its Affiliates,"[4] *id*. at 62; and

- for customers who are in "Unsupported Jurisdictions" where Binance.US does not acquire the necessary license to operate within six months, Voyager will convert coins to dollars for distribution to the users, *id*. at 63-64.

The provision clarifies that the government may seek to stop

certain transactions or effectuate new regulations but does not carve

out from the exculpation provision any other form of government action,

such as criminal prosecutions.

> For the avoidance of doubt, the foregoing paragraph reflects the fact that Confirmation of the Plan requires the Exculpated Parties to engage in certain rebalancing transactions and distributions of cryptocurrencies and the fact that no regulatory authority has taken the position during the Combined Hearing that such conduct would violate applicable laws or regulations. **Nothing in this provision shall limit in any way the powers of any Governmental Unit to contend that any rebalancing**

---

[4] Some of those affiliates have recently been sued by the Commodity Futures Trading Commission for, among other things, inadequate know-your-customer rules designed to prevent money laundering. *See* Complaint, *CFTC v. Zhao, et al.*, No. 23-cv-01887 (N.D. Ill. filed Mar. 27, 2023).

**transaction should be stopped or prevented, or that any other action contemplated by the Plan should be enjoined or prevented from proceeding further. Nor does anything in this provision limit the enforcement of any future regulatory or court order that requires that such activities either cease or be modified, or limit the penalties that may be applicable if such a future regulatory or court order is issued and is violated**. Similarly, nothing herein shall limit the authority of the Committee on Foreign Investment of the United States to bar any of the contemplated transactions. Nor does anything in this provision alter the terms of the Plan regarding the compliance of the Purchaser with applicable laws in the Unsupported Jurisdictions before distributions of cryptocurrency occur in those Unsupported Jurisdictions.

*Id*. at 8 (emphasis added). While the court contemplated that the government could seek to enjoin particular transactions after the court approved the plan, or seek other prospective relief, it forbade the government from pursuing its civil or criminal remedies relating to transactions that occur before they are stopped or prevented. *See id*. And Voyager and the Committee have now asserted that the sale to Binance.US must close in less than two weeks, by April 18, 2023. Voyager Mem. 1-2, 11; UCC Mem. 7-8, 44-45.

Although a governmental carve-out was nominally put back in the plan, it applies only "[e]xcept as set forth in the exculpation provisions

12

. . . and in this Confirmation Order" (A.45-46)—leaving the exculpation provision's restrictions unaffected.

The plan also has a separate exculpation provision specific to the Distribution Agent's (Binance.US, Voyager, and the Wind-Down Debtor's) "discharge of the powers and duties conferred upon" it by the plan or any bankruptcy court order, which includes an exception for "criminal conduct, or ultra vires acts." Plan at 51; Confirmation Order at 7-8. But that exception is notably absent from the confirmation order's general exculpation provision, and the confirmation order provides that in the case of any conflict, the terms of the confirmation order control. (A.54).

## C. Prior Proceedings

The bankruptcy court denied the government's motion to stay the confirmation order (or, at a minimum, the exculpation provision) pending appeal. (A.180-97). The court rejected the idea that the exculpation provision "might somehow be interpreted as immunizing fraud, or theft, or tax avoidance" (A.187), but did not alter the confirmation order itself.

13

On March 27, the district court granted a stay pending appeal, followed by an opinion dated March 31 and corrected April 1, 2023. (A.198-218). The district court explained that the government had established that there are "serious questions going to the merits of the dispute," and "the balance of hardships tips decidedly in its favor." (A.211 (quotation marks omitted)). It found "persuasive[]" that the proper role of exculpation provisions is to allow parties to engage in "the bankruptcy proceeding" itself without fear of later litigation over their actions in those proceedings. (A.211-12). But the court concluded that reasoning cannot apply to "Government enforcement of the law following confirmation." (A.212). More generally, bankruptcy deals with "the relations between a debtor and his creditors—not the relations between third-parties and non-stakeholder Government enforcers." (A.212 (quotation marks and alterations omitted)). And "a bankruptcy court has limited, if any, jurisdiction over criminal cases," and no party cited authority showing a bankruptcy court can release criminal liability. (A.212-13).

The district court stated it "appear[s] likely that some species of quasi-judicial immunity applies to at least some parties executing the

rebalancing transactions"—in this case Voyager operates as a bankruptcy trustee would, and bankruptcy trustees "are generally immune to the extent that they are acting with the approval of the court." (A.213-14 (quotation marks omitted)). But it concluded that the exculpation provision "appears to go further than the quasi-judicial immunity doctrine allows," as it applies to injunctive relief and criminal prosecution. (A.214-15). Additionally, the district court noted immunity is an affirmative defense, not granted preemptively. (A.215). And it observed that interfering with criminal prosecution violated the general rule that equity should not interfere with criminal process, and raised "significant separation of powers concerns" by "rewrit[ing] statutes of limitations" and "preventing the Executive Branch from investigating acts and enforcing the law." (A.215).

The district court then concluded that the balance of injuries and the public interest favor a stay. While acknowledging the harm to Voyager, its customers, and its creditors from delay in postponing the plan, the court determined that the balance of hardships favors the government, whose sovereign interest in enforcing the law and protecting the public, as well as its right to appellate review, could be

lost if the appeal of the bankruptcy court's order were to become equitably moot. (A.216-17).

The district court directed expedited briefing on the underlying appeal, to be completed by April 18. (A.218).

## ARGUMENT
### POINT I
### This Court Lacks Jurisdiction over This Appeal

To begin with, this appeal must be dismissed for lack of jurisdiction. Voyager and the Committee have appealed the district court's order granting a stay of the bankruptcy court's order while the appeal before the district court is pending. That is neither a final decision disposing of the matter before the district court under 28 U.S.C. § 158(d)(1), nor an appealable injunction under § 1292(a).

This Court has jurisdiction under § 158(d)(1) "only over 'final' district court orders" where the district court rules on an appeal from a bankruptcy court. *In re Flor*, 79 F.3d 281, 283 (2d Cir. 1996). While "the concept of 'finality' is more flexible in the bankruptcy context than in ordinary civil litigation," *id.*, that "pragmatic approach to finality does not overcome the general aversion to piecemeal appeals," *In re AroChem*

*Corp.*, 176 F.3d 610, 619 (2d Cir. 1999) (quotation marks omitted). The district court's appellate order must still "'finally dispose of discrete disputes within the larger case.'" *Flor*, 79 F.3d at 283 (quoting *In re Sonnax Industries*, 907 F.2d 1280, 1283 (2d Cir. 1990)); *accord Ritzen Group, Inc. v. Jackson Masonry, LLC*, 140 S. Ct. 582, 586 (2020) ("Orders in bankruptcy cases qualify as 'final' when they definitively dispose of discrete disputes within the overarching bankruptcy case."). The mere "determination of a separable issue" is not sufficient; "a 'dispute' in this context means at least an entire claim for which relief may be granted"—thus, an appealable final decision "necessarily resolves all of the issues pertaining to a discrete claim." *Flor*, 79 F.3d at 283; *accord Shimer v. Fugazy (In re Fugazy Express, Inc.)*, 982 F.2d 769, 776 (2d Cir. 1992).

Those principles require dismissal of this appeal. While this Court has not addressed this scenario, the Third Circuit has held it lacks jurisdiction over appeals from district court orders granting stays pending a bankruptcy appeal in the district court. "An order granting a stay pending appeal is usually not appealable." *In re Trans World Airlines, Inc.* ("*TWA*"), 18 F.3d 208, 216 (3d Cir. 1994). "Even under the

most relaxed concept of finality," such orders "cannot be viewed as the equivalent of a final order." *Id*.; *accord In re Forty-Eight Insulations, Inc.*, 115 F.3d 1294, 1299 (7th Cir. 1997) ("Even under this more relaxed standard" orders denying a stay pending appeal are not "final").

Although that rule may not apply where "an indefinite stay order unreasonably delays" a party's right to have its appeal heard, *TWA*, 18 F.3d at 216 (quotation marks omitted), that is not the case here, where the district court is proceeding expeditiously with the appeal. Similarly, if the effect of the denial of a stay is to prevent a party " 'from obtaining a full airing of its issues on appeal and a decision on the merits' " because its interests would be "lost forever"—that is, "it is all but assured that [some event] will render an appeal moot absent a stay"— then the stay denial is appealable as a final order under § 158(d)(1). *S.S. Body Armor I., Inc. v. Carter Ledyard & Milburn LLP*, 927 F.3d 763, 769 (3d Cir. 2019) (quoting *In re Revel AC, Inc.*, 802 F.3d 558, 567 (3d Cir. 2015)). But while the denial of a stay may be appealable because it has the "practical effect" of resolving an appeal on the merits, the grant of a stay—as in this case—leaves the merits open for later determination. *Revel*, 802 F.3d at 567; *accord S.S. Body Armor*, 927

F.2d at 769 n.2; *TWA*, 18 F.3d at 215 (when district-court appellant obtains stay of bankruptcy court's order, it "merely maintains the status quo pending the district court's resolution"); *see Nken v. Holder*, 556 U.S. 418, 429 (2009) (a "stay simply suspends judicial alteration of the status quo" (quotation marks and alteration omitted)). Either way, Voyager and the Committee will have every ability to be fully heard on the merits: nothing in the record suggests that their property interests or legal rights will be unavoidably lost if the reorganization plan is put on hold while the district court (again, on an expedited schedule) resolves the government's appeal. *See infra* Point II.C.[5]

For similar reasons, no appeal lies under 28 U.S.C. § 1292(a), which permits appeal of an order "granting [or] refusing [an] injunction[ ]." That "narrowly tailored exception" to the final-judgment

---

[5] Nor, contrary to the Committee's argument, raised only in a footnote (UCC Mem. 20 n.3), is the stay a reviewable collateral order. A collateral-order appeal requires three "stringent" conditions to be met: the order must "[1] conclusively determine the disputed question, [2] resolve an important issue completely separate from the merits of the action, and [3] be effectively unreviewable on appeal from a final judgment." *Will v. Hallock*, 546 U.S. 345, 349 (2006) (quotation marks omitted). The stay order here is not conclusive, nor does it resolve any question, as it is merely an interim order restoring the status quo pending full resolution of the merits.

rule, *Huminski v. Rutland City Police Dep't*, 221 F.3d 357, 359 (2d Cir. 2000), allows the Court to review interlocutory orders of district courts only when they are "directed to a party, enforceable by contempt, and designed to accord or protect some or all of the substantive relief sought by a complaint." *HBE Leasing Corp v. Frank*, 48 F.3d 623, 632 (2d Cir. 1995) (citation omitted); *accord Henrietta D. v. Giuliani*, 246 F.3d 176, 182 (2d Cir. 2001); *Nosik v. Singe*, 40 F.3d 592, 596 (2d Cir. 1994). To appeal an interlocutory order under § 1292(a)(1), a litigant must show that it "might have a 'serious, perhaps irreparable, consequence,' and that the order can be 'effectually challenged' only by immediate appeal." *Nosik*, 40 F.3d at 596 n.9 (quoting *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 84 (1981)).

Appellants cannot make that showing. Generally, a stay pending appeal is not an injunction: an injunction commands or forbids a person to act, but "[b]y contrast . . . a stay operates upon the judicial proceeding itself." *Nken*, 556 U.S. at 429. While both "can have the practical effect of preventing some action before the legality of that action has been conclusively determined . . . a stay achieves this result by temporarily suspending the source of authority to act—the order or judgment in

question—not by directing an actor's conduct." *Id.* at 428-29. A stay that suspends a prior judicial order "return[s] to the status quo—the state of affairs before the . . . order was entered"; it is therefore the type of order that "'relates only to the conduct or progress of litigation before the court,'" which "'ordinarily is not considered an injunction'" and therefore is not appealable under § 1292(a)(1). *Id.* at 429-30 (quoting *Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 485 U.S. 271, 279 (1988)).

Such is the case here. The district court's order simply suspends the bankruptcy court's confirmation order while the appeal to the district court is pending. The stay order "does not decide the ultimate issue in the litigation" as required for a § 1292(a) appeal. *TWA*, 18 F.3d at 215. Nor can it be seen as functionally the equivalent of an injunction. As more fully addressed in Point II.C below, the record does not show that appellants will be irreparably harmed by allowing the district court's stay to remain in effect during the expedited appeal. And they will have full rights to challenge the district court's ultimate decision to this Court at the end of that appeal. *See Sahu v. Union Carbide Corp.*, 475 F.3d 465, 468 (2d Cir. 2007) (no jurisdiction under

21

§ 1292(a) where parties "have not shown that all the relief sought will be unavailable if we wait until after the district court proceedings are final before hearing an appeal").

The Committee points to *Barretta v. Wells Fargo Bank, N.A.* (UCC Mem. 17)—a nonprecedential decision that did not reach the issue but instead "exercis[ed] hypothetical jurisdiction." 693 F. App'x 26, 27 (2d Cir. 2017). Although the Seventh Circuit asserted § 1292(a) jurisdiction in *Forty-Eight Insulations*, that case involved the denial of a stay pending appeal and thus allowed a bankruptcy court order to take effect, with the consequence that the objecting party would have "little hope" of obtaining relief. 115 F.3d at 1300.[6] But as explained above, the grant of a stay leaves the merits open for determination by the courts. And the alleged harm from the district court's stay is not irreparable, as

---

[6] The Committee cites *In re A & F Enterprises, Inc. II*, 742 F.3d 763, 766 (7th Cir. 2014), but that decision only cited *Forty-Eight Insulations* and offered no separate analysis. The Committee also points to *In re Fremont Sheep Co.*, 110 F.3d 73 (10th Cir. 1997) (unpublished table decision). But that decision is also nonprecedential. And it relies on a Tenth Circuit standard for determining if an order is a reviewable injunction that appears far broader than this Court's. *Id.* at *1 (citing *Consumers Gas & Oil, Inc. v. Farmland Indus., Inc.*, 84 F.3d 367, 370 (10th Cir. 1996)).

the parties could excise the exculpation clause and then would be free to proceed with their bankruptcy plan. *See infra* Point II.C.

Accordingly, the Court lacks jurisdiction over these appeals. Even if the Court construes the appeal as a petition for mandamus, *Kensington Int'l Ltd. v. Republic of Congo*, 461 F.3d 238, 242 (2d Cir. 2006), it should deny the writ.[7] "The touchstones for an exercise of the mandamus power are a showing of usurpation of power, clear abuse of discretion and the presence of an issue of first impression." *Id.* (quotation marks omitted). Accordingly, the Court "may issue a writ of mandamus only if: (1) the petitioners have 'no other adequate means to attain the relief [they] desire[ ],' (2) the petitioners' 'right to issuance of the writ is clear and indisputable,' and (3) [the Court is] 'satisfied that the writ is appropriate under the circumstances.'" *In re A.H.*, 999 F.3d 98, 105 (2d Cir. 2021) (quoting *Cheney v. U.S. District Court*, 542 U.S.

---

[7] Voyager cites the All Writs Act, 28 U.S.C. § 1651(a) (Voyager Mem. 11-12 n.1); presumably it means to invoke the Court's mandamus authority, as that is the writ "most commonly sought" under § 1651(a) in the courts of appeals. Fed. R. App. P. 21 adv. comm. note 1967. The two cases it cites are inapposite: *In re American Express Financial Advisors Securities Litigation*, 672 F.3d 113 (2d Cir. 2011), addresses a district court's authority to order cessation of arbitration; *Michael v. INS*, 48 F.3d 657 (2d Cir. 1995), concerns a stay of deportation issued to an administrative agency.

367, 380-81 (2004)). As explained below, appellants cannot meet that demanding burden.

## POINT II

### Voyager's Motion to Vacate the District Court's Stay of the Confirmation Order Should Be Denied

If the Court determines it has jurisdiction, it should leave the stay in place. The district court correctly ordered the confirmation order to be stayed. The bankruptcy court manifestly erred by confirming the exculpation provision, and the government is likely to prevail in its appeal of that provision. The district court was also correct that the balance of equities favors a stay: Voyager has left no doubt that if the stay is lifted, it intends to evade appellate review by substantially consummating the plan and then seeking to dismiss the government's district-court appeal on equitable-mootness grounds. Voyager's litigation strategy threatens to deprive the government of its appellate rights before *any* Article III court has assessed the lawfulness of the bankruptcy court's order—an order that would itself deprive the government of its inherent sovereign ability to enforce the law in the public interest. Those harms are manifestly irreparable and greatly outweigh any harm to appellants from a stay—indeed, without the

24

exculpation provision, appellants will find themselves in the same position as any other commercial actor: able to conduct their transactions as long as they obey the law. The motion to vacate the district court's stay must therefore be denied.

And that is true in particular under the stringent mandamus standard. As explained below, the stay order was correct. But at the least, Voyager and the Committee cannot come close to showing that they have a "clear and indisputable" right to have the stay lifted and to implement their cryptocurrency transactions free from any court supervision or prospect of law enforcement. Nor is there "no other adequate means" for them to implement the bankruptcy plan: were they simply to withdraw the exculpation clause, there would be no objection to their plan and they could proceed. And finally, mandamus is not "appropriate under the circumstances," where the district court issued a stay in order to preserve the status quo so that it could continue—on an expedited schedule—considering the appeal that properly lies before it.

## A. Standard for a Vacating a Stay Pending Appeal

"The well-established principles" that guide the determination whether "to stay a judgment entered below are equally applicable when

25

considering an application to vacate a stay." *Certain Named &
Unnamed Non-Citizen Children & Their Parents v. Texas*, 448 U.S.
1327, 1330 (1980) (Powell, J., in chambers); *Coleman v. Paccar Inc.*, 424
U.S. 1301, 1304 (1976) (Rehnquist, J., in chambers) (same). The stay
factors are: "(1) whether the stay applicant has made a strong showing
that he is likely to succeed on the merits; (2) whether the applicant will
be irreparably injured absent a stay; (3) whether issuance of the stay
will substantially injure the other parties interested in the proceeding;
and (4) where the public interest lies." *In re World Trade Center
Disaster Site Litigation*, 503 F.3d 167, 170 (2d Cir. 2007) (footnote and
quotation marks omitted). As the parties seeking relief from the lower
court's order, appellants bear the burden of demonstrating their
entitlement to such relief. *Cf. Park Village Apartment Tenants Ass'n v.
Mortimer Howard Tr.*, 636 F.3d 1150, 1160 (9th Cir. 2011) ("[T]hose
seeking injunctive relief, not those opposing that relief, are responsible
for showing irreparable injury").[8] When courts of appeals have

---

[8] Rather than determining the likelihood of success on the merits, the
district court (A.211 & n.6) applied an alternative standard, whether
there are "sufficiently serious questions going to the merits." *Citigroup
Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*,

jurisdiction they review a district court's stay order for abuse of discretion, *see S.S. Body Armor*, 927 F.3d at 772—though, as noted above, in this case the mandamus standard should apply.

The district court properly applied those factors to stay the bankruptcy court's order pending appeal, and this Court should not disturb its decision. In particular, this Court should be "reluctan[t]" to overturn the stay because the appeal of the bankruptcy court's order is still pending in the district court, and "the vacation of an interim order invades the normal responsibility of [the district] court to provide for the orderly disposition of cases on its docket." *Certain Named & Unnamed Non-Citizen Children & Their Parents v. Texas*, 448 U.S. 1327, 1330–31 (1980) (Powell, J., in chambers). That is "especially" true where, as here, the district court "is proceeding to adjudication on the merits with due expedition." *Doe v. Gonzales*, 546 U.S. 1301, 1308 (2005) (Ginsburg, J., in chambers).

---

598 F.3d 30, 35 (2d Cir. 2010). As the district court noted, that standard has been called into question, but this Court has held it remains viable. *Id*. at 35-38. And "no party . . . questioned its applicability" below. (A.211 n.6). Nevertheless, the applicability of the serious-questions standard need not be addressed in this appeal, as the government demonstrated its likelihood of success on the merits below, and appellants have not met their burden to overturn that.

27

## B. Appellants Are Unlikely to Prevail on the Merits Because the Bankruptcy Court Erred in Confirming the Exculpation Provision

Appellants are unlikely to prevail on the merits because the

bankruptcy court manifestly erred by confirming the exculpation

provision. The provision bars the Executive Branch from enforcing

federal civil and criminal laws against a wide array of individuals for

any action those individuals might take to implement the bankruptcy

plan (with limited narrow exceptions for actual fraud, willful

misconduct, and gross negligence). And it applies not only to conduct

during bankruptcy proceedings but also to conduct that has not yet

occurred. Nothing in the Bankruptcy Code authorizes this

extraordinary intrusion into law-enforcement functions.

### 1. The Bankruptcy Court Lacked Statutory Authority to Confirm the Exculpation Provision

Bankruptcy is the "subject of the relations between [a] . . . debtor[ ]

and his creditors, extending to his and their relief." *Wright v. Union*

*Central Life Ins. Co.*, 304 U.S. 502, 513-14 (1938) (quotation marks

omitted); *accord Northern Pipeline Construction Co. v. Marathon Pipe*

*Line Co.*, 458 U.S. 50, 71 (1982) (plurality op.) ("the restructuring of

debtor-creditor relations . . . is at the core of the federal bankruptcy

power"). Congress enacted the Bankruptcy Code under the Constitution's Bankruptcy Clause, which allows Congress to "adjust[ ] . . . a failing debtor's obligations," *Railway Labor Execs.' Ass'n v. Gibbons*, 455 U.S. 457, 466 (1982) (quotation marks omitted). The Code's intricate provisions are intended to give the honest but unfortunate debtor a fresh start while ensuring the maximum possible equitable distribution to creditors. *See Stellwagen v. Clum*, 245 U.S. 605, 617 (1918); *Williams v. U.S. Fid. & Guar. Co.*, 236 U.S. 549, 554-55 (1915). Accordingly, the Code permits the discharge of certain debtors against prepetition claims by creditors, 11 U.S.C. § 1141(d)—though liquidating debtors like Voyager are not even entitled to such a discharge, *id.* § 1141(d)(3).

Because the purpose of bankruptcy is to adjust the debtor-creditor relationship, the Code is replete with provisions related to that objective. But no Code provision authorizes bankruptcy courts to grant absolute immunity from criminal or civil liability not only to a debtor but to others as well—much less for conduct that has not even occurred by the time a plan is confirmed.

Only a single Code provision, 11 U.S.C. § 1125(e), remotely contemplates any such form of immunity for post-petition conduct. But Congress limited that provision to "[a] person that solicits acceptance or rejection of a plan," or "that participates . . . in the offer, issuance, sale, or purchase of a security, offered or sold under the plan." *Id.* The provision protects only against liability "on account of such solicitation or participation." *Id.* And the provision does not confer absolute immunity from suit; it simply provides an affirmative defense to a subsequent lawsuit. *See, e.g.*, *SEC v. Universal Exp., Inc.,* 475 F. Supp. 2d 412, 425-26 (S.D.N.Y. 2007) (Lynch, J.) (noting that defendant bears burden of proof on defense under § 1125(e)), *aff'd sub nom. SEC v. Altomare*, 300 F. App'x 70 (2d Cir. 2008).

That narrow provision bears no resemblance to the expansive exculpation the bankruptcy court approved, which applies to *any* action taken to implement the transactions contemplated by the plan (present or future) and which confers not merely an affirmative defense but complete immunity from the very initiation of a civil or even criminal proceeding. *Cf. Law v. Siegel*, 571 U.S. 415, 424 (2014) ("The Code's meticulous—not to say mind-numbingly detailed—enumeration of

30

exemptions and exceptions to those exemptions confirms that courts are not authorized to create additional exceptions."). "[W]ere [Congress] to intend a major departure" from the fundamental principle that bankruptcy exists to adjust the debtor-creditor relationship, "more than simple statutory silence" is required. *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 465 (2017).

Other provisions reinforce this conclusion. For example, Congress has made clear that debtors are not excused from general regulatory requirements but must comply with the law like everyone else. 28 U.S.C. § 959(b). The Code also exempts governmental criminal, regulatory and police proceedings from the automatic stay that bars certain litigation while a bankruptcy is pending. 11 U.S.C. §§ 362(b)(1), (4). And even when a bankruptcy case ends, the status of "[h]aving been a debtor in bankruptcy" does not "authorize a firm to operate a nuisance . . . or otherwise excuse it from complying with laws of general application." *In re CMC Heartland Partners*, 966 F.2d 1143, 1146 (7th Cir. 1992); *see O'Loghlin v. County of Orange*, 229 F.3d 871, 875 (9th Cir. 2000) ("A suit for illegal conduct occurring after discharge threatens neither the letter nor the spirit of the bankruptcy laws. A

'fresh start' means only that; it does not mean a continuing licence to violate the law."). The bankruptcy court's assertion of authority cannot be reconciled with the special solicitude the Code accords governmental law-enforcement efforts.

The bankruptcy court's order is also contrary to the manner in which laws are typically investigated and enforced. The court emphasized that, during the bankruptcy proceeding, the government did not contend the contemplated plan would "violate any applicable" laws. (A.163). But the government is not required to determine whether and to what extent a proposed plan or its manner of implementation might violate federal laws before plan confirmation—much less in less than four months between the proposed plan and its confirmation in this case—on pain of losing the ability to bring civil and even criminal claims in the future.

It is Congress's prerogative to enact statutes of limitation setting time limits for the government to investigate and prosecute civil and criminal violations. These generally provide the government several years after the conduct to investigate and to decide whether to bring a claim or prosecute an offense. *See, e.g.,* 31 U.S.C. § 3731(b)(1) (statute of

limitations for the False Claims Act as long as ten years from the false claim depending on when the government learns of it). And it is the Executive Branch's prerogative to decide whether and how to investigate congressionally proscribed behavior. *See Heckler v. Chaney*, 470 U.S. 821, 831-35 (1985). Such investigations take time and involve the development of complex or extensive factual records. Investigations into wrongdoing typically occur after wrongdoing has taken place; it is rare for the government to identify a criminal or civil violation before it happens or for a party to obtain an advance ruling on the legality of its anticipated conduct. Requiring all governmental units to engage in such analysis on a timeline that meets a commercial transaction's exigencies or else be unable to pursue wrongdoing, especially in the regulatorily volatile and sensitive cryptocurrency space, is exceptionally inappropriate.

Similar separation-of-powers concerns underlie the sharp limits on pre-enforcement challenges to statutes in Article III courts. To bring such a challenge, a plaintiff must demonstrate "sufficiently imminent" enforcement, " 'a credible threat of prosecution,' " or " 'an actual and well-founded fear that the law will be enforced against them.' " *Susan B.*

33

*Anthony List v. Driehaus*, 573 U.S. 149, 158-61 (2014) (quoting cases).
But unless that harm is "certainly impending," a plaintiff lacks
standing, *Clapper v. Amnesty Int'l USA,* 568 U.S. 398, 416 (2013)—a
doctrine that itself is rooted in separation of powers, *Raines v. Byrd*, 521
U.S. 811, 820 (1997). Under the bankruptcy court's view in this case,
however, the exculpated parties are entitled to a judicial order
exempting them from any number of statutes, well before there is any
threat or even possibility of enforcement. Nothing in the Bankruptcy
Code—much less its silence—can support such an extraordinary
exercise of the bankruptcy court's power in contravention of established
separation-of-powers principles.

The bankruptcy court's order is especially anomalous as it extends
even to criminal misconduct. Article I bankruptcy judges have no power
whatsoever over criminal matters. *See Travelers Indemnity Co. v.
Bailey*, 557 U.S. 137, 153 n.6 (2009) (bankruptcy court's decision "to
conduct a criminal trial" would be "plainly beyond [its] jurisdiction"
(quotation marks omitted)); *In re Rae*, 436 B.R. 266, 275 (Bankr. D.
Conn. 2010) ("As a matter of law, this Court lacks subject matter
jurisdiction over alleged violations of criminal statutes."); *cf.* 18 U.S.C.

34

§ 3613 (preventing bankruptcy courts from discharging criminal fines). Since bankruptcy judges may not hear criminal cases, Congress could not have intended—by statutory silence, no less—to authorize bankruptcy courts to extinguish such cases before they are brought and before the predicate conduct has even occurred.

Finally, the bankruptcy court's order violates core principles of due process. The provision applies not only to the government but to anyone who might wish to recover against the exculpated individuals in the future. Congress must "enact exceedingly clear language if it wishes to significantly alter . . . the power of the Government over private property." *U.S. Forest Serv. v. Cowpasture River Pres. Ass'n*, 140 S. Ct. 1837, 1849-50 (2020). Yet, without statutory authority, the order prospectively eliminates exculpated causes of action, "a species of property." *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982). And although the Due Process Clause does not apply to governmental entities, the Supreme Court has stated that notice provisions in bankruptcy law—which can apply to the government—should follow the "basic principle of justice . . . that a reasonable opportunity to be heard

35

must precede judicial denial of a party's claimed rights." *City of New York v. New York, N.H. & H.R. Co.*, 344 U.S. 293, 297 (1953).

At a minimum, therefore, there is "substantial doubt whether" the bankruptcy court's interpretation of its statutory authority comports with either separation-of-powers or due-process principles of the Constitution. *United States v. Security Indus. Bank*, 459 U.S. 70, 78 (1982). "[I]n the absence of a clear expression of Congress' intent" to permit bankruptcy courts to approve exculpation provisions of this breadth, this Court should not "construe the [Code] in a manner that could in turn call upon the Court to resolve" the constitutional issues presented by this appeal. *Id.* at 82 (quotation marks omitted).

And besides the need for constitutional avoidance, the Code's silence imposes a further barrier to applying the exculpation provision to the government: absent unequivocal statutory language, the government retains its sovereign immunity. *FDIC v. Meyer*, 510 U.S. 471, 475 (1994); *United States v. Dalm*, 494 U.S. 596, 608 (1990). Congress has waived the United States' sovereign immunity in bankruptcy proceedings only in three limited circumstances: "(1) where the substantive authority for the cause of action arises from the

Bankruptcy Code itself; (2) for compulsory counterclaims against government claims; and (3) for permissive counterclaims capped by a set-off limitation." *McGuire v. United States*, 550 F.3d 903, 912-13 (9th Cir. 2008) (citing 11 U.S.C. §§ 106(a)-(c)). But it is evident that none of these waivers apply here. As discussed below, none of the statutes relied on by the bankruptcy court or cited by appellants confers authority to immunize parties from the government's police and regulatory powers—especially given the requirements that waivers of sovereign immunity must be clear and unequivocal, *see Lane v. Pena*, 518 U.S. 187, 192 (1996); *United States v. Testan*, 424 U.S. 392, 399 (1976), and must be strictly applied against the claimant, *see Library of Congress v. Shaw*, 478 U.S. 310, 314, 318-21 (1986). Without an applicable waiver of sovereign immunity, the bankruptcy court had no jurisdiction to enter any exculpation order that limited the government's authority.

## 2. The Statutes Cited by the Bankruptcy Court and the Appellants Do Not Support the Exculpation Clause

The bankruptcy court maintained that the exculpation provision was authorized by 11 U.S.C. § 1142(a). (A.162-64). But that provision merely provides that, "[n]otwithstanding any otherwise applicable

37

nonbankruptcy law, rule, or regulation relating to financial condition, the debtor and any entity organized or to be organized for the purpose of carrying out the plan shall carry out the plan and shall comply with any orders of the court." 11 U.S.C. § 1142(a). Nothing in this provision authorizes a bankruptcy court to prohibit the government from enforcing federal law or to shield conduct from governmental scrutiny. Moreover, the provision extends only to "the debtor and any entity organized or to be organized for the purpose of carrying out the plan." *Id.* The challenged exculpation clause, however, sweeps far more broadly.

Other Code provisions cited by appellants do not supply the necessary authorization either. Appellants point to 11 U.S.C. § 105(a) (Voyager Mem. 14-15; UCC Mem. 27), which provides a "court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of" the Code. But this "equitable power[] . . . can only be exercised within the confines of the . . . Code." *Norwest Bank Worthington v. Ahler*, 485 U.S. 197, 206 (1988). "It does not authorize the bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law, or constitute a roving commission to

do equity." *In re Dairy Mart Convenience Stores, Inc.*, 351 F.3d 86, 92 (2d Cir. 2003) (quotation marks omitted).

Accordingly, § 105(a)'s grant of general authority does not allow bankruptcy courts to enter orders that would contravene the Code. *Law*, 571 U.S. at 421. This conclusion "is simply an application of the axiom that a statute's general permission to take actions of a certain type must yield to a specific prohibition found elsewhere." *Id.* That axiom has special force when a statute contains "carefully calibrated exceptions and limitations," as the Bankruptcy Code does. *Id.* at 424. "Where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent." *Andrus v. Glover Constr. Co.*, 446 U.S. 608, 616-17 (1980). Because the exculpation provision cannot be reconciled with the Code's text, structure, or purposes, *see supra* Point II.B.1, it is not authorized by § 105(a).

Section 105(a) does not support Voyager for a second, independent reason. Its authority is limited to "order[s] . . . necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). If "no provision of the Bankruptcy Code may be successfully

invoked . . . , section 105(a) affords . . . no independent relief." *Dairy Mart*, 351 F.3d at 92; *accord In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 142 (2d Cir. 2005). It is therefore not a freestanding source of authority at all.

The UCC suggests 11 U.S.C. § 1123(b)(6) provides the bankruptcy court with the requisite authority. (UCC Mem. 27). But that provision merely states a bankruptcy plan may include "any other appropriate provision not inconsistent with the applicable provisions" of the Code. Like § 105(a), this general provision does not supply authority to adopt a plan provision incompatible with the Code or to alter the fundamental fabric of bankruptcy.

Finally, Voyager relies on 11 U.S.C. § 1129(a)(3) (Voyager Mem. 14, 16), which states a plan may not be confirmed unless it was "proposed in good faith and not by any means forbidden by law." That requirement likewise does not authorize a bankruptcy court to adopt an exculpation provision of this breadth.

### 3. No Court Has Approved a Similar Exculpation Clause

No decision of the Supreme Court or a court of appeals allows exculpation against the government in any similar circumstances. Most

courts approving exculpation rely on a policy rationale—avoiding sour-grapes litigation between parties to the commercial deals embodied in a bankruptcy plan—that has nothing to do with regulators such as the government. And two courts of appeals prohibit exculpation outright. *In re Western Real Est. Fund, Inc.*, 922 F.2d 592, 600 (10th Cir. 1990); *In re Highland Cap. Mgmt., LP*, 48 F.4th 419, 435-38 (5th Cir. 2022) (exculpation of non-debtors "runs afoul" of the "statutory bar on non-debtor discharge" in 11 U.S.C. § 524(e)).

Where other courts of appeals have permitted less expansive forms of exculpation, they generally limit such relief to acts the debtor and the creditors' committee undertake during the bankruptcy proceeding itself, based on the notion that the participants in that process should not later sue each other, having already litigated or settled before the bankruptcy court. *See Blixseth v. Credit Suisse*, 961 F.3d 1074, 1083-84 (9th Cir. 2020) (allowing exculpation of debtors and members of the creditors' committee for "acts committed during the process of developing and confirming a Chapter 11 plan"; purpose of exculpation is to "allow the settling parties . . . to engage in the give-and-take of the bankruptcy proceeding without fear of subsequent

litigation over any potentially negligent actions in those proceedings");

*In re PWS Holding Corp.*, 228 F.3d 224, 246-47 (3d Cir. 2000)

(upholding a provision that limits liability of members of a creditors'

committee to willful misconduct or *ultra vires* acts "in the event that

they were sued for their participation in the reorganization").[9] But the

rationale of preventing bankruptcy participants from relitigating

resolved issues after plan confirmation has no application to the

government enforcing its police and regulatory powers.[10] Indeed, as the

---

[9] The Committee cites a treatise to suggest a blanket rule that " '[i]n the absence of gross negligence or intentional wrongdoing, parties should not be liable' " for court-authorized actions. (UCC Mem. 28 (quoting 4 Collier on Bankruptcy ¶ 524.05 n.15b, miscited as 7 Collier ¶ 1103.05)). But the treatise did not endorse that provision; it was merely quoting a bankruptcy case authored by the same bankruptcy judge that issued the exculpation order at issue in this appeal.

[10] While a few courts in this Circuit have referred to exculpation clauses as "reasonable and customary," or "standard in this district," one of those cases dismissed as equitably moot a challenge to such a provision and merely quoted the bankruptcy court's characterization of the provision, *see In re Enron Corp.*, 326 B.R. 497, 504 (S.D.N.Y. 2005), and others only briefly if at all considered any objections to the appropriateness of exculpation, and included no statutory or constitutional analysis, *see In re Granite Broad. Corp.*, 369 B.R. 120, 139 (Bankr. S.D.N.Y. 2007). Regardless, the prevalence of a practice when untested by legal objections does not make that practice lawful. *See Webster v. Fall*, 266 U.S. 507, 511 (1925) ("Questions which merely lurk in the record, neither brought to the attention of the court nor

42

Ninth Circuit has noted, "confirmation of a plan does not insulate debtors from prosecution for criminal activity, even if that activity is part of the plan itself." *Garvin v. Cook Invs. NW, SPNWY, LLC*, 922 F.3d 1031, 1036 (9th Cir. 2019).

Appellants have cited, and we are aware of, just a single case that expressly applies exculpation to a government agency: *In re Airadigm Commc'ns, Inc.*, 519 F.3d 640, 655-56 (7th Cir. 2008). That out-of-Circuit decision approved a third-party release that contained an exculpation provision applicable to the Federal Communications Commission (FCC). *Id.* at 655-57. But the FCC did not raise the constitutional questions the government now raises, and the Seventh Circuit did not consider (much less reject) them, or construe the Code to avoid them. Even then, the court expressly found that the provision preserved certain non-monetary regulatory authority, since it did not allow for the exculpated party to "use this limitation as a way of skirting the FCC's regulations regarding the use, possession, or transfer of the licenses." *Id.* at 657.

─────────────

ruled upon, are not to be considered as having been so decided as to constitute precedents.").

No authority holds that common-law or judicially created immunity doctrines could apply to specific statutory enforcement schemes or criminal law.[11] And even assuming that a species of immunity might apply to some future government action, it would create at most an affirmative defense to liability in a future proceeding, just like § 1125(e), *see Universal Exp., Inc.,* 475 F. Supp. 2d at 425-26 — and just like the non-bankruptcy doctrines of absolute and qualified immunity. *See, e.g., Imbler v. Pachtman*, 424 U.S. 409, 419 (1976) ("An absolute immunity defeats a suit at the outset, so long as the official's actions were within the scope of the immunity."). Similarly, the immunity some courts recognize as arising under 11 U.S.C. § 1103(c) for bankruptcy court-appointed officers and committees, *see PWS Holding*, 228 F.3d at 246-47, is itself an affirmative defense with its own fact-based exceptions, *see, e.g.*, *In re Center Teleproductions, Inc.*, 112 B.R.

---

[11] Voyager maintains that "the Eighth Circuit has held" quasi-judicial immunity applies to criminal liability. (Voyager Mem. 21). But as the district court stated, that was eight-decade-old dicta, as the circuit ultimately rejected the proposition in that case; moreover, the Eighth Circuit limited that potential doctrine to "good faith" acts. (A.214 (citing *Braatelien v. United States*, 147 F.2d 888, 895 (8th Cir. 1945))).

567, 580 (Bankr. S.D.N.Y. 1990) (no immunity when a party claims the court order a trustee purportedly followed was obtained through fraud).

It is thus impossible to assess whether a party is entitled to immunity (or any similar protection) for implementing a transaction when the transaction has not even yet occurred. The Committee objects to the district court's observation that immunity is an affirmative defense by conflating that with the district court's separate conclusion that equity principles cannot support enjoining criminal prosecution. (UCC Mem. 37-38). But the latter point correctly supports the district court's broader determination that the bankruptcy court, or any court of equity, cannot interfere in any way with criminal processes. *See supra* at 34. On the former point, to the extent the Committee contends that "extinguish[ing] liability" *ex ante* is equivalent to providing an affirmative defense, that ignores the fact that anyone asserting an affirmative defense is required to demonstrate that it is appropriate under the actual facts and circumstances at hand. *See Stewart v. Lattanzi*, 832 F.2d 12, 13 (2d Cir. 1987) ("[s]ome factual inquiry must be made to determine whether the duties . . . were judicial or prosecutorial in nature entitling them, or any of them, to absolute immunity"). That

45

is far different from the absolute immunity granted by the exculpation

clause for conduct that has yet to occur.

### 4. The Exculpation Clause's Exceptions Do Not Mitigate Its Flaws

The bankruptcy court suggested that the exculpation provision is

narrow and adequately protects the government's rights, but its

reasoning was flawed.

First, the exculpation provision does not merely protect parties for

following a court order as it is not limited to specific actions approved by

the bankruptcy court. For example, it protects against any liability at

all "based on [the Exculpated Parties'] execution and completion of the

rebalancing transactions and the distribution of cryptocurrencies to

creditors in the manner provided in the Plan." Confirmation Order at 7-

8. The plan does not spell out with precision all of the many steps the

parties must take to implement these transactions. *See supra* at 10-11.

To the contrary, the transactions include whatever "Debtors and the

Committee jointly determine to be necessary to implement the

transactions described in the Plan." Plan at 13-14; *see also* Plan at 30.

And other actions necessary to implement the plan are left open for

further negotiations, such as Voyager and Binance.US developing a

46

"mutually agreed upon integration plan" to enable the migration of Voyager users to the Binance.US platform, which will require, *inter alia*, migrating user data. Dkt. 853 at 58; *see also supra* at 10-11. In other words, the court gave a broad exculpation of liability for conduct that has not yet occurred, at least in substantial part, with license for certain parties to later determine how to accomplish the transactions. Indeed, the exculpation provision arguably does not even exempt *ultra vires* conduct. *See supra* at 13.

Second, the court emphasized that the provision includes an exception for "actual fraud, willful misconduct, or gross negligence." (A.7-8). But that exception is limited, and does not appear to apply to the rebalancing transactions and distribution of cryptocurrencies, for which the exculpation provision states the exculpated parties "have no liability." (A.8). In any event, the government enforces statutes that do not require those elements, and the bankruptcy courts lack authority to rewrite them. For example, there are securities and other violations that may be established based only on negligence, *see, e.g.*, *SEC v. Ginder*, 752 F.3d 569, 574 (2d Cir. 2014), and tax liabilities may arise when transactions have certain structures or features, regardless of a

47

taxpayer's mental state. Although the bankruptcy court later stated it did not intend the exculpation provision to apply to tax liabilities (A.187), that is not apparent from the provision itself, which it did not modify. Moreover, the very fact that Voyager and the UCC have refused to carve the government out of the exculpation provision emphasizes their belief in its coverage. (UCC Mem. 31 ("no one would participate" in proposed transactions absent preemptive exculpation from government enforcement)).

The bankruptcy court also emphasized that the order carves out prospective injunctive relief, as well as monetary relief under any regulatory or court orders issued after the plan is confirmed. (A.185-87). But these exceptions do not help given Voyager's firm and open determination to consummate the plan as soon as possible. Dist. Ct. Dkt. Ex. E at 34-35.

Finally, the bankruptcy court faulted the government for not having identified legal problems with the contemplated transactions when asked to do so before the confirmation hearing. (A.184). But this gets the analysis backwards. The transactions approved by the plan have largely not happened yet, their precise details are unknown, and

they will occur in the unsupervised discretion of the parties. The
government cannot be required to speculate about the lawfulness of a
contemplated action, including any steps parties to that action may
choose to take, on pain of forever losing the ability to apply its ordinary
law enforcement powers to the entire enterprise.

## C. The Remaining Stay Factors Emphatically Favor the Government

When the government is a party, harm to the government and
weighing the public interest "merge." *Nken*, 556 U.S. at 435. And
"[t]here is always a public interest in" preventing violations of U.S. law.
*Id*. That interest is paramount in this case. The exculpation clause
would prevent the government from "effectuating statutes enacted by
representatives of [the] people," meaning that the government (and by
extension the public) will "suffer[ ] a form of irreparable injury" as a
result. *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in
chambers); *accord Dist. 4 Lodge of the Int'l Assoc. of Machinists &
Aerospace Workers v. Raimondo*, 18 F.4th 38 (1st Cir. 2021); *Thompson
v. DeWine*, 959 F.3d 804 (6th Cir. 2020); *Hand v. Scott*, 888 F.3d 1206
(11th Cir. 2018); *Veasey v. Abbott*, 870 F.3d 387 (5th Cir. 2017); *N.M.
Dep't of Game & Fish v. Dep't of the Interior*, 854 F.3d 1236, 1254-55

(10th Cir. 2017); *O Centro Espirita Beneficiente Uniao de Vegetal v. Ashcroft*, 314 F.3d 463 (10th Cir. 2002).

Appellants contend the government has "conceded" that this harm "is hypothetical." (UCC Mem. 39; Voyager Mem. 23). That is not true. As the cases above make clear, there is always a real harm to the public and to the government when the government cannot enforce the law. The fact that any specific law-enforcement action is hypothetical (UCC Mem. 39-40) does not mean that the harm from tying the government's law-enforcement hands is not real. Appellants' argument is akin to contending that if a court ordered a police department immediately disbanded, there would be no injury to the public if the city could not identify a specific pending murder that would occur.

Appellants' litigation strategy only compounds the harm to the government and the public if the stay is vacated. The record makes clear that Voyager intends to seek to destroy the government's right to review: it has plainly stated its intention to ensure the appeals become equitably moot and then seek to preclude any appellate consideration of the exculpation clause. Dist. Ct. Dkt. 5, Ex. E, at 34-35 ("Our position is once [the bankruptcy court] gives us authority to go forward with the

50

transaction, we're going to do that. And then we're going to argue that appeals are equitably moot . . . .").

The government vigorously disputes the potential applicability of the equitable-mootness doctrine to this case. S*ee In re Metromedia Fiber Network*, 416 F.3d at 144-45 (explaining doctrine). But if a court rejects those arguments, there will be no appellate review. The stay entered by the district court—or at the least, a stay against the exculpation clause—is necessary to preserve the government's right to obtain appellate review of the validity of the exculpation provision. And vacatur of the stay could "entirely destroy [the government's] rights to secure meaningful review," which itself constitutes irreparable harm. *Providence Journal Co. v. FBI*, 595 F.2d 889, 890 (1st Cir. 1979). It would be contrary to public policy if Voyager and other exculpated parties were released from potential criminal and civil liability simply because a business transaction took place before the merits of this appeal could be decided.

The Committee asserts that "it is well settled in this Circuit that the risk of mootness is not *itself* irreparable harm." (UCC Mem. 43). The cases they cite say the opposite: "Courts are divided, and the Second

Circuit has not yet spoken, on the issue of whether the risk that an appeal may become moot in the absence of a stay pending appeal satisfies the irreparable injury requirement." *In re Adelphia Commc'ns Corp.*, 361 B.R. 337, 347 (S.D.N.Y. 2007); *accord In re Windstream Holdings, Inc.*, No. 20 Civ. 4276 (VB), 2020 WL 4481933, at *3 (S.D.N.Y. Aug. 3, 2020). *Adelphia* also held the opposite: "loss of appellate rights is a quintessential form of prejudice. Thus, where the denial of a stay pending appeal risks mooting any appeal of significant claims of error, the irreparable harm requirement is satisfied." 361 B.R. at 348 (quotation marks and footnote omitted). Regardless, in this case, where the avowed intent of a party is to ensure the loss of appellate rights, the government is not merely invoking a theoretical risk of mootness.

No countervailing harm will result from upholding the district court's stay. To the contrary, Voyager and the Committee will suffer no legally cognizable injury at all by abandoning the exculpation provision. Without it, they are in the same position as everyone else in the commercial world, crypto or otherwise: they are free to conduct their transactions, but with no preexisting immunity from law enforcement. Businesses large and small decide whether to adopt practices or engage

in transactions without demanding that they be released *ex ante* from potential liability to the government if those practices—or the specific means they choose to use to implement them—violate the law. "[T]he fact [that a private entity] must comply with the law . . . does not constitute irreparable harm—it is the absolute minimum that could be expected . . . ." *Brady v. National Football League*, 640 F.3d 785, 795 (8th Cir. 2011) (Bye, J., dissenting). If appellants ultimately prevail, the exculpated parties will retain the benefits of the exculpation provision. If the government prevails, it will be because the exculpated parties were never entitled to the provision's protection to begin with—but they would remain free to assert any available affirmative defenses in response to any civil or criminal enforcement actions that may arise.

To the extent appellants contend that they cannot move forward because the entire plan confirmation is stayed, the government has repeatedly stated that only the exculpation clause is objectionable—appellants need only excise that clause (and, like all other entities, take responsibility on themselves for complying with legal requirements rather than relying on before-the-fact exculpation), or the Court need only stay the exculpation provision but not the rest of the plan, in order

53

for appellants to proceed with the transactions contemplated by the plan. Then Voyager's customers can retrieve their assets; and creditors can be paid in accordance with the plan. The parties' refusal to consummate those transactions without the absolute protection of the exculpation clause demonstrates that their supposed inability to effectuate the plan is an injury of their own making. *See Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976) (per curiam) (litigant cannot "be heard to complain about damage inflicted by its own hand"); *Colorado v. EPA*, 989 F.3d 874, 888 (10th Cir. 2021) (self-inflicted harm is not irreparable for injunction purposes).

Although appellants now claim there is no alternative except this Court's vacatur of the stay by April 13, appellants have not met their evidentiary burden on this point. For example, the APA allows Binance.US a 30-day extension right, Dkt. 835 at 77, beyond the April 18 deadline cited by appellants (Voyager Mem. 11), but appellants have submitted no evidence to the Court that Binance.US is unwilling to agree to a brief extension while the district court decides the merits of the appeal that will be fully briefed by April 18 under the current schedule. Accordingly, while the appellants suggest that the deal with

54

Binance.US will collapse (UCC Mem. 3 (the stay "*may* scuttle the entire purchase" (emphasis added))), they have offered no evidence that will occur.

Moreover, appellants did not request any change in the briefing schedule in the district court that would have allowed the appeal to be decided on the merits before April 13, though the district court invited the parties to suggest a different schedule. (A.218). Instead, appellants ask this Court to vacate the district court's stay, so they can consummate the transaction and then argue that no Article III review is available.

## Conclusion

The Court should deny the motions. If this Court vacates the district court's stay, the government respectfully requests an administrative stay for seven days so the Solicitor General may determine whether further review is warranted.

April 6, 2023                              Respectfully submitted,

RAMONA D. ELLIOTT                DAMIAN WILLIAMS
Deputy Director/General Counsel   United States Attorney for the
P. MATTHEW SUTKO                  Southern District of New York
Associate General Counsel

                                  /s/ Jean-David Barnea
/s/ Beth A. Levene                LAWRENCE H. FOGELMAN
BETH A. LEVENE                    JEAN-DAVID BARNEA
Trial Attorney                    PETER ARONOFF
Department of Justice             BENJAMIN H. TORRANCE
Executive Office for              Assistant United States Attorneys
United States Trustees            United States Attorney's Office
441 G Street, NW, Suite 6150      Southern District of New York
Washington, DC 20530              86 Chambers Street, Third Floor
Tel: (202) 307-1399              New York, NY 10007
Beth.A.Levene@usdoj.gov          Tel: (212) 637-2800
                                  Lawrence.Fogelman@usdoj.gov

WILLIAM K. HARRINGTON
United States Trustee for Region
2
LINDA A. RIFFKIN
Assistant United States Trustee
Department of Justice
Office of the United States
Trustee
Alexander Hamilton Custom
House
One Bowling Green, Room 534
New York, NY 10004
Tel: (212) 510-0500
Linda.Riffkin@usdoj.gov

56

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), the above-named counsel hereby certifies that this memorandum complies with the type-volume limitation of the Federal Rules of Appellate Procedure, on the assumption that the Court grants Appellants' motion for an expansion of the word limit. As measured by the word processing system used to prepare it, this memorandum contains 11,241 words.