# Nos. 23-467, 23-469

*In the*

# United States Court of Appeals

*for the*

# Second Circuit

———

IN RE VOYAGER DIGITAL HOLDINGS, INC., et al., *Debtors*

OFFICIAL COMMITTEE OF UNSECURED CREDITORS
OF VOYAGER DIGITAL HOLDINGS, INC,
*Appellant*,

– v. –

UNITED STATES OF AMERICA, et al.

*Appellees.*

———

On appeal from the United States District Court for
the Southern District of New York

———

**REPLY IN SUPPORT OF EMERGENCY MOTION OF THE
OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO
VACATE THE DISTRICT COURT'S STAY**

———

**Action requested by or before April 12, 2023**

———

DARREN AZMAN
JOSEPH B. EVANS
   McDermott Will & Emery LLP
   One Vanderbilt Avenue
   New York, NY 10017-3852
   (212) 574-5400

PAUL W. HUGHES
ANDREW A. LYONS-BERG
CHARLES SEIDELL
   McDermott Will & Emery LLP
   500 North Capitol Street NW
   Washington, DC 20001
   (202) 756-8000

*Counsel for the Official Committee of Unsecured Creditors*

# TABLE OF CONTENTS

Table of Authorities .................................................................................. ii

Introduction ............................................................................................ 1

Argument ................................................................................................ 5

    A. This Court has jurisdiction. ............................................................ 5

    B. The government is wrong on the merits. ....................................... 8

    C. The equitable factors overwhelmingly favor
       consummation of the Plan. ........................................................... 15

Conclusion ............................................................................................ 18

# TABLE OF AUTHORITIES

## Cases

*A.W. Chesterton Co. v. Chesterton*,
   907 F. Supp. 19 (D. Mass. 1995) ................................................................ 16

*In re Airadigm Commc'ns, Inc.*,
   519 F.3d 640 (7th Cir. 2008) ........................................................... 8, 9, 10

*Barnhart v. Peabody Coal Co.*,
   537 U.S. 149 (2003) ...................................................................................... 12

*Carson v. Am. Brands*,
   450 U.S. 79 (1981) ...................................................................................... 5, 6

*City of New York v. N.Y., N.H. & H.R. Co.*,
   344 U.S. 293 (1953) ...................................................................................... 12

*Matter of Forty-Eight Insulations, Inc.*,
   115 F.3d 1294 (7th Cir. 1997) .................................................................... 5, 6

*S.S. Body Armor I., Inc. v. Carter Ledyard & Millburn LLP*,
   927 F.3d 763 (3d Cir. 2019) ........................................................................ 7

*Stewart B. McKinney Found, Inc. v. Town Plan & Zoning Comm'n of
   Fairfield*,
   790 F. Supp. 1197 (D. Conn. 1992) ........................................................ 7, 16

*Taggart v. Lorenzen*,
   139 S. Ct. 1795 (2019) .................................................................................. 8

*In re Trans World Airlines, Inc.*,
   18 F.3d 208 (3d Cir. 1994) ........................................................................... 7

*United States v. Spallone*,
   399 F.3d 415 (2d Cir. 2005) ........................................................................ 14

## Statutes

11 U.S.C.
   § 105 ....................................................................................................... 8, 12
   § 106 ........................................................................................................... 13
   § 1125(e) .................................................................................................... 11
   § 1142(a) ...................................................................................................... 8

28 U.S.C. § 1292(a) ........................................................................................ 5

## INTRODUCTION

The central theme of the government's brief—that "[i]t is not too much to ask Voyager and the other parties to comply with federal law in implementing the plan" (Gov't Br. 3)—is nothing short of incredible. The reason the exculpation clause is so essential to the Plan is because the government *will not commit* to a position as to whether the cryptocurrency transactions required to be executed by the Plan violate any federal laws or regulations.

As the bankruptcy court recognized, the government overstates the impact of the exculpation clause. Contrary to the government's characterization, the government has every right to later determine that any of the 106 cryptocurrencies on the Voyager platform are securities or that BAM Trading Services Inc. ("Binance U.S.") is operating contrary to the law. It just cannot punish individual professionals who are compelled by the bankruptcy court to execute the transactions required by the Plan.

The government could resolve the issue presented here if it were to expressly confirm—in a manner that could be relied upon by the parties—that it will not pursue criminal, civil, or regulatory sanctions against individuals or entities who simply carry out the bankruptcy court's orders. Despite repeated opportunities, the government has refused to make such assurances.

1

If anything, the government hints (*e.g.*, Gov't Br. 47)—but does not state—that certain transactions would be an unlawful exchange of unregistered securities. And it warns of "the regulatorily volatile and sensitive cryptocurrency space." Gov't Br. 33. To be sure, the bankruptcy court has made abundantly clear that it will modify the Plan if necessary to conform to applicable legal requirements—once informed by the government of what it views those requirements to be. And the bankruptcy court took pains to ensure that certain transactions would comply with various state regulatory requirements. *See* App'x 171a (noting that "the plan itself does not have the power to sweep away the different regulations that apply in different states").

We are here because the government—itself largely responsible for the "regulator[y] volatil[ity] (Gov't Br. 33) it observes—refuses to take a position. Rather, the government maintains that the statute of limitations baked into criminal offenses "provide" it "several years after the conduct to investigate and to decide whether to bring a claim or prosecute an offense." Gov't Br. 32. The government's position is as clear as it is terrifying: The government insists that it must have years to decide whether to pursue "criminal claims" against individuals who "implement[]" a "proposed plan" and who will have no choice whether to do so because they will be required to by court order. Gov't Br. 32. With that risk of criminal exposure, it is hard

2

to fathom who would undertake these responsibilities—which is precisely why the parties have not "voluntarily excised" (Gov't Br. 3) the exculpation clause.

The government retorts that, "[e]very day, parties engage in substantial commercial transactions (including transactions involving cryptocurrency) without the benefit of a preemptive release from criminal and civil liability." Gov't Br. 3. True, individuals trading in their own accounts choose to buy and sell various crypto assets, taking on risk that the government may later bring charges. But one fact makes all the difference: Here, the professionals are compelled to execute the crypto transactions at the direction of a federal court, as steps necessary to consummate a Chapter 11 reorganization. These individuals will perform pursuant to court order, acting as de facto if not de jure agents of the bankruptcy court to restore significant assets to more than a million individual creditors.

Against that backdrop, the government lacks all credibility in suggesting that the injury here is one of the parties' "own making" (Gov't Br. 54), and in feigning surprise that the parties have not voluntarily withdrawn the exculpation clause (*id*. 3, 22-23, 53). The government cannot chastise the parties for an alleged failure to "take responsibility on themselves for complying with legal requirements" (Gov't Br. 53) when the government will not say what the "legal requirements" *actually are* in the context of these

3

highly novel issues. Yes, the parties want the Plan to consummate, returning substantial assets to creditors who desperately need their crypto returned. But it is not reasonable to expect individuals to put themselves at risk of criminal prosecution for performing a judicial order.

This Court's immediate action is required. The linchpin of the Plan is the Asset Purchase Agreement. And, to close by April 18, the parties must undertake actions by April 13.

Vacatur is plainly warranted: The necessity for immediate action to save the Plan confirms that the Court has jurisdiction; the government has failed to prove that it was likely to prevail on the merits; and the equities overwhelmingly cut against the government's request for a stay. In all, the carefully Plan should go into immediate effect.

For its part, if the government ever wishes to demonstrate that some transactions should be blocked by the bankruptcy court as unlawful, it will have every opportunity to do so. The government's interests in this case now—which it starkly admits are nothing beyond "hypothetical"—cannot possibly justify scuttling the Plan, costing creditors $100 million in lost assets. The district court should never have granted a stay, and this Court should vacate it immediately.

4

## ARGUMENT

### A.    This Court has jurisdiction.

The government begins by challenging this Court's jurisdiction (Gov't Br. 16-24)—but its objections on this score are meritless.

*First*, the government has precious little to say about the primary jurisdictional basis invoked in our brief (at 17-19): Jurisdiction is proper under 28 U.S.C. § 1292(a) because the district court's stay order "has the practical effect of . . . an injunction," "might have a serious, perhaps irreparable consequence," and "can be effectually challenged only by immediate appeal." *Carson v. Am. Brands*, 450 U.S. 79, 84 (1981) (quotation marks omitted); *see, e.g.*, *Matter of Forty-Eight Insulations, Inc.*, 115 F.3d 1294, 1300 (7th Cir. 1997) (holding that jurisdiction over a district court order denying a stay in a bankruptcy case was proper on this basis).[1]

The government's sole response to this authority is to assert that, unlike in *Forty-Eight Insulations*, here there is no irreparable harm from the district court's stay order, and that "the merits" remain "open for determination by the courts." Gov't Br. 22. Not only does this argument essentially merge the jurisdictional question with the equitable balancing analysis on

---

[1] The government's argument that the stay order is not *literally* an injunction (Gov't Br. 19-21) is beside the point: Under *Carson*, Section 1292(a) provides for jurisdiction both over actual injunctions and over orders with the same practical effect.

5

the merits, we have also already explained why it is wrong: If the district court's stay is not lifted in the next several days, the parties cannot undertake the steps required to compel Binance.US to close the underlying transaction; absent that transaction, Voyager's creditors will lose $100 million. UCC Br. 44-46; *see* pages 15-16, *infra*.

That is undoubtedly a "serious, perhaps irreparable" consequence that can be avoided "only by immediate appeal." *Carson*, 450 U.S. at 84. And it is directly analogous to the harm that justified a Section 1292(a) appeal in *Forty-Eight Insulations*, where, absent relief, "a substantial distribution from the Trust balance" would have "so depleted [the trust] that the Claimants[] will have little hope of receiving the same payment as other . . . claimants." 115 F.3d at 1300. Just so here: if the Binance.US deal does not close, Voyager's creditors will have little hope of receiving the distributions they could otherwise expect, because "the uncontroverted evidence" is that "a loss of the Binance.US transaction would lead to a reduction of approximately $100 million in the assets available for distribution to creditors." App'x 196a. Interlocutory appellate jurisdiction is secure under *Carson* and *Forty-Eight Insulations*.[2]

---

[2]   The government also asserts that there is no irreparable harm because Voyager and the Committee could simply accede to its demand to "excise the exculpation clause," and the government would let the restructuring

*Second*, the government acknowledges that an order is "appealable as a final order under [28 U.S.C.] § 158" where a party's "interests would be 'lost forever' . . . absent a stay." Gov't Br. 18 (quoting *S.S. Body Armor I., Inc. v. Carter Ledyard & Millburn LLP*, 927 F.3d 763, 769 (3d Cir. 2019)). Per the government's preferred authority, courts may exercise jurisdiction where "the issues raised … are effectively unreviewable on appeal from a final judgment." *In re Trans World Airlines, Inc.*, 18 F.3d 208, 217 (3d Cir. 1994). Even if the grant of a stay pending appeal does not generally meet those criteria (Gov't Br. 17-18), they are met here, where $100 million in creditor value will be lost forever if the Binance.US transaction is not free to proceed on April 18, which requires actions by the parties on April 13. *See* UCC Br. 19-20. The central, practical issue presented here is unreviewable in any later proceeding.

*Finally*, the government does not dispute that—even if all of the above were wrong—the Court may construe the papers in this appeal as a request for mandamus relief, and exercise jurisdiction on that basis. Gov't Br. 23-24; *see* UCC Br. 21. Thus, at the very least, mandamus provides a jurisdictional backstop for the Court's consideration of the merits.

---

move forward. Gov't Br. 22-23. But as discussed in greater detail below (*see infra* pages 15-16), "a party does not have to acquiesce in a violation of its rights to avoid a claim of self-infliction of injury" in the irreparable-harm analysis. *Stewart B. McKinney Found, Inc. v. Town Plan & Zoning Comm'n of Fairfield*, 790 F. Supp. 1197, 1209 (D. Conn. 1992).

**B.    The government is wrong on the merits.**

The government is also wrong that "the bankruptcy court manifestly erred by confirming the exculpation provision." Gov't Br. 24. As our motion explained in detail, bankruptcy courts have ample authority—derived from 11 U.S.C. § 105 and the doctrine of quasi-judicial immunity—to prevent parties from being "penalized just for doing what [the bankruptcy court] ha[s] ordered them to do." App'x 187a; *see* UCC Br. 27-31.[3] The government's responses do not persuade.

**1.** Again, the government's brief largely talks past our core point about the basis for the district court's authority: Section 105 empowers the bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the bankruptcy code]" (11 U.S.C. § 105(a))—and because Section 1142 provides that "the debtor" and other related entities "*shall* carry out the plan and *shall* comply with any orders of the court" (11 U.S.C. § 1142(a) (emphases added)),[4] it can sometimes be "necessary or appropriate" to immunize those parties from liability that might otherwise arise merely from their compliance with the court's orders.

---

[3]    *See also, e.g.*, App'x 192a ("The Order that I have entered is narrow in scope and is limited to the protection of people who, at least for now and in the absence of regulatory action, will have to do what my order requires.").

[4]    This mandate to comply with bankruptcy court orders is backed up by the contempt power. *See Taggart v. Lorenzen*, 139 S. Ct. 1795, 1801 (2019).

Indeed, that is precisely what the Seventh Circuit held in *Airadigm*. There, the bankruptcy court granted a broad release to a third-party provider of financing from "all liability 'in connection with' the reorganization except for willful misconduct," including with respect to "the consummation of th[e] Plan, or the administration of th[e] Plan or property to be distributed under th[e] Plan," and including liability to a federal government agency (the FCC). *In re Airadigm Commc'ns, Inc.*, 519 F.3d 640, 655 (7th Cir. 2008). As the Seventh Circuit explained, this was an appropriate exercise of the bankruptcy court's "traditionally broad" equitable powers as "codifie[d]" by Section 105, because the release of liability was necessary to secure the financier's participation in the reorganization: "Given how narrow the limitation is and how essential TDS [the financier] was for the reorganization, the release is 'appropriate' and thus within the bankruptcy court's powers." *Id.* at 657-658; *see also id.* at 657 ("[W]hether a release is 'appropriate' for the reorganization [under Section 105] is fact intensive and depends on the nature of the reorganization."). Just so here.

The government attempts to distinguish *Airadigm* on the grounds that the release there "preserved certain non-monetary regulatory authority" for the FCC. Gov't Br. 43. But as we have already explained, the same is true here: The exculpation clause leaves the government free to return to court to prevent, *ex ante*, any transaction that it believes to be unlawful;

9

what it cannot do is stand by while a transaction approved and required by the bankruptcy court is performed, and then later seek to hold liable (or criminally prosecute) the parties involved. *See* UCC Br. 29-30; App'x 195a ("I could not have said any more clearly that the Government is free at any time to take action to stop the Debtors' cryptocurrency trades and/or cryptocurrency distributions if the Government decides that those activities should be stopped.").[5]

What is more, the exculpation clause flows from the well-recognized principles of judicial immunity, which extend to those individuals who carry out a court's order. *See* UCC Br. 30-31. The government objects on the basis of timing: Immunity, the government claims, is an affirmative defense raised *after* a criminal prosecution is initiated, whereas the exculpation clause grants some distinct "absolute immunity." Gov't Br. 45-46. But this distinction does not exist: Nothing in the exculpation clause purports to bar the government from *bringing* a criminal or civil claim; rather, the exculpation clause would function as affirmative defense to liability for that claim. That defense would be subject to all the usual counterarguments (like

---

[5] This also answers the government's objection that Section 105 "does not . . . constitute a roving commission to do equity" untethered to other provisions of the bankruptcy code. Gov't Br. 38-40. As *Airadigm* explains, the court's equitable Section 105 power may be invoked in furtherance of the code provisions regarding reorganization plans where "the release [is] necessary for the reorganization and appropriately tailored." 519 F.3d at 657.

waiver), and the party invoking it must "demonstrate that" its invocation "is appropriate under the actual facts and circumstances at hand." Gov't Br. 45. If a party's conduct falls outside the exculpation provision—perhaps because an individual acts with gross negligence or because the individual does something other than that required to effectuate the Plan—the affirmative defense would fail.

The exculpation clause serves as judicial confirmation of the backdrop principles of immunity that shield individuals from liability for performing court orders. The bankruptcy court's case-specific articulation of that principle is no doubt warranted here, where the government refuses to represent whether it believes the steps ordered are indeed lawful.

**2.** The government's makes a series of meritless arguments suggesting that the bankruptcy court lacked the authority to approve the Plan. Bankruptcy courts must be able to review and approve plans, which required a determination that the Plan requires only lawful transactions.

First, the government suggests that the existence of 11 U.S.C. § 1125(e), which provides categorical immunity to bankruptcy parties under certain narrow circumstances, somehow forecloses the power exercised by the bankruptcy court under Section 105 here. *See* Gov't Br. 30-31, 39. But the conclusion simply does not follow from the premise: Congress's choice (embodied in Section 1125(e)) that immunity is *always* appropriate in one

11

narrow circumstance does nothing to indicate that exculpation will *never* be "necessary or appropriate" (*id.* § 105(a)) under other circumstances, and thus authorized under Section 105. *See, e.g.*, *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003) ("We do not read the enumeration of one case to exclude another unless it is fair to suppose that Congress considered the unnamed possibility and meant to say no to it.").

Next, the government departs from the statute, asserting that several external sources of law counsel against interpreting Section 105 to authorize exculpation. *See generally* Gov't Br. 32-37. Those objections range from irrelevant (statutes of limitations; pre-enforcement challenges), to asked-and-answered (criminal authority, *see* UCC Br. 35-36), to downright fanciful, such as the government's invocation of due process, which it *admits* "does not apply to governmental entities." Gov't Br. 35. And while the bankruptcy code's notice provisions may well "embod[y] [the] basic principle of justice . . . that a reasonable opportunity to be heard must precede judicial denial of a party's claimed rights" (*City of New York v. N.Y., N.H. & H.R. Co.*, 344 U.S. 293, 297 (1953)), the government here had *ample* "opportunity to be heard," and declined to argue to the bankruptcy court that any crypto transactions contemplated by the Plan here would be unlawful. Having done so, the government can hardly now invoke fairness principles to justify

12

the prosecution of parties who will simply carry out the court-approved Plan.

Lastly, the government contends that sovereign immunity somehow prohibits the action of the bankruptcy court here. Gov't Br. 36-37. This argument is nonsense. Nobody has suggested suing the government for anything. But even if sovereign immunity were relevant, the Bankruptcy Code *does* contain a relevant waiver: 11 U.S.C. § 106 provides that "sovereign immunity is abrogated" by more than fifty provisions, including Sections 105 and 1142, such that "[t]he court may hear and determine any issue arising with respect to the application of such sections to governmental units" and "may issue against a governmental unit an order, process, or judgment under such sections." Applying Section 105 "to governmental units" is precisely what the bankruptcy court did here.

**3.** Finally, the government (at 46-49) attempts to quibble with the bankruptcy court's own explanation of the scope of its order—but those arguments fail as well.

That is, the government *again* attempts to portray the exculpation provision as doing more than simply precluding liability for—in the bankruptcy court's words—"doing what I have ordered [the parties] to do." App'x 187a. *See, e.g.*, Gov't Br. 47 (asserting that the third paragraph of the exculpation clause, which the bankruptcy court itself inserted, "does not appear

13

to" be limited by the exception for fraud, gross negligence, or willful misconduct); *id.* at 10 (same). The bankruptcy court already addressed these contentions, and explained that they "are red herrings," rejecting the notion "that my Order might somehow be interpreted as immunizing fraud, or theft, or tax avoidance." App'x 187a.[6]

The government attempts to evade the court's interpretation of its own order (Gov't Br. 48), but has no answer whatsoever for our demonstration that, "[w]hen an issuing judge interprets his own orders, we accord substantial deference to the draftsman," and a "judge's construction of an ambiguity in his own words" is definitive absent an "abuse of discretion." *United States v. Spallone*, 399 F.3d 415, 423 (2d Cir. 2005); *see* UCC Br. 42.

As the bankruptcy court explained, "[t]he point is to protect the parties from belated allegations that those very activities"—*i.e.*, "buy[ing] and sell[ing] cryptocurrencies as part of the portfolio rebalancing that the plan requires, and . . . distribut[ing] cryptocurrencies to customers"— "are somehow violative of law and that parties should be penalized just for doing what

---

[6]  *See also id.* ("Although the plan and the Confirmation Order require the parties to sell cryptocurrencies, they certainly do not require (or permit) anyone to commit fraud in the course of doing so, or to engage in theft in the course of doing so. Similarly, there is nothing in the plan that requires or permits the Debtors to evade their tax obligations, and there is nothing in my Order that reasonably could be construed to mean that the Debtors do not have to pay taxes.") (citations omitted).

I have ordered them to do." App'x 187a. That is not the expansive release the government envisions—it simply prohibits the government from punishing individuals because it later decided some of the cryptocurrency transactions required by the Plan are illegal.

## C. The equitable factors overwhelmingly favor consummation of the Plan.

Finally, the government's cursory treatment of the equities (Gov't Br. 49-55) cannot rescue the district court's improperly entered stay.

The government says almost nothing about our demonstration that, if the stay is not vacated by April 12, the Binance.US transaction is likely to fall through, with a resulting loss of *$100 million* to Voyager's creditors. *See generally* UCC Mem. 44-46. All the government can muster is that, in its view, Voyager has not *proven* that Binance.US will actually pull out of the deal rather than grant an extension. Gov't Br. 54. It is the Committee's understanding that Voyager asked Binance.US for an extension, which Binance.US has refused.

The government also takes the rather brazen position that this potential $100 million harm (and Voyager's and its creditors' other ongoing harms, including the draining of the bankruptcy estate and creditors continued inability to access their savings) is "injury of [appellants'] own making"—and thus not irreparable harm—because "appellants need only excise [the exculpation] clause," and the government will withdraw its appeal.

15

Gov't Br. 53-54 (citing cases for the proposition that "self-inflicted" harm does not justify injunctive relief). That is a bit like saying the injury to the shopkeeper from his store burning down is self-inflicted when he has failed to pay "insurance" to the mobster—perhaps technically true as a matter of but-for cause, but not as a matter of legal right. Unsurprisingly, the government cites no case holding that a party's harm is self-inflicted simply because it could avoid those harms by acquiescing in a violation of its legal rights. The limited case law that even addresses such an outlandish claim is to the contrary. *See, e.g.*, *Stewart B. McKinney Found, Inc. v. Town Plan & Zoning Comm'n of Fairfield*, 790 F. Supp. 1197, 1209 (D. Conn. 1992) ("[A party] does not have to acquiesce in a violation of its rights to avoid a claim of self-infliction of injury"); *A.W. Chesterton Co. v. Chesterton*, 907 F. Supp. 19, 24 (D. Mass. 1995) (same).

The government seems to have lost sight of what really matters here—returning to creditors the crypto assets that they badly need. The creditors are over a million retail customers, some of whom continue having difficulty paying for basic expenses (like mortgage payments and car loans) because of this bankruptcy. While the government claims to be seeking to protect the public, it is doing precisely the opposite by launching this campaign to preserve some hypothetical right to prosecute professionals acting at the direction of the bankruptcy court. The government has every right to pursue

16

prosecution of wrongdoing and to finally make a decision on certain crypto-currencies and types of crypto transactions. But that should not be paid for by innocent creditors of Voyager, who need their crypto back now.

The government also errs in its presentation of its own purported harms. *See* Gov't Br. 49-52. We have already demonstrated at length that the government's asserted injury is hypothetical because it has not even taken the position that the transactions at issue are unlawful. *See* UCC Br. 50. This is not a case where the government seeks the ability to protect the public by enforcing settled legal prohibitions against unknown future viola-tions (*cf.* the government's hypothetical about "identify[ing] a specific pend-ing murder that would occur" if the police department was disbanded); what the government wants here is the ability to *decide* after the fact that *known* categories of transactions are illegal—when it has declined to object to those very same transactions when given the chance—and thus to prosecute par-ties merely "for doing what [the bankruptcy court] ha[s] ordered them to do." App'x 187a.

Moreover, the government repeatedly asserts the supposed harm that would befall it from the Plan being consummated "before *any* Article III court has assessed the lawfulness of the bankruptcy court's order." Gov't Br. 24; *see also id.* at 50-51, 55. But that rhetoric conveniently overlooks that *this* Court is an Article III court—and, if the Court grants the Committee's

17

and Voyager's requested relief, it will have decided that the government is unlikely to prevail on the merits of its appeal.

In short, the concrete—and massive—harm that will befall Voyager's creditors if the stay is not vacated far outweighs the government's hypothetical concerns.

## CONCLUSION

The Court should vacate the stay entered by the district court.

Dated: April 7, 2023

Respectfully submitted,

/s/ *Paul W. Hughes*

DARREN AZMAN
JOSEPH B. EVANS
  *McDermott Will & Emery LLP*
  *One Vanderbilt Avenue*
  *New York, NY 10017-3852*
  *(212) 574-5400*

PAUL W. HUGHES
ANDREW A. LYONS-BERG
CHARLES SEIDELL
  *McDermott Will & Emery LLP*
  *500 North Capitol Street NW*
  *Washington, DC 20001*
  *(202) 756-8000*

  *Counsel for the Official Committee*
  *of Unsecured Creditors*

19

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), the under-signed counsel for Appellant certifies that this motion:

(i) complies with Rule 27(d)(2), on the assumption the Court grants Appellant's motion for an expansion of the word limit, because it contains 4,062 words, including footnotes and excluding the parts of the brief exempted by Rule 32(f); and

(ii) complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Office Word 2016 and is set in New Century Schoolbook font in a size equivalent to 14 points or larger.

Dated: April 7, 2023                                    */s/ Paul W. Hughes*

## CERTIFICATE OF SERVICE

I hereby certify that that on April 7, 2023, I filed the foregoing brief via the Court's CM/ECF system, which effected service on all registered parties to this case.

Dated: April 7, 2023                    /s/ *Paul W. Hughes*